1
2
3
4
5
6
7
8

# UNITED STATES  DISTRICT COURT

9

## Northern District of California

10

San Francisco Division

11

ENGLISH & SONS, INC, et. al

No. 3:15-cv-01382-LB

12

Plaintiffs/Counter-Defendants,

**ORDER GRANTING IN PART AND DENYING IN PART COUNTER-DEFENDANTS' MOTION TO DISMISS**

13

v.

STRAW HAT RESTAURANTS INC, et al.

14

Defendants/Counter-Claimants.

[Re: ECF No. 17]

15

_____/

16

## INTRODUCTION

17     This case involves the Straw Hat Pizza® restaurants. (Third Amended Complaint ("TAC"), ECF

18   No. 1-14, ¶ 7.)[1] The plaintiffs/counter-defendants include the six remaining members of Straw Hat

19   Cooperative Corporation, a not-for-profit California consumer cooperative, and they operate their

20   Straw Hat Pizza restaurants as Cooperative members. (*Id.*) The other 31 former members of Straw

21   Hat Cooperative now operate their Straw Hat Pizza restaurants as franchisees of the

22   defendant/counter-claimant Straw Hat Restaurants, Inc. (*Id.* ¶¶ 7, 53.) The parties dispute who has

23   the right to control Straw Hat Cooperative and its trademarks and assets. The lawsuit started in

24   2011 in state court, and the pleadings now are a third amended complaint ("TAC") and a third

25   amended counter-complaint ("TACC"). (*Id.*; TACC, ECF No. 15.) The TACC challenges (among

26   other things) the plaintiffs/counter-defendants' transfer of the Straw Hat marks to Straw Hat IP

27

28          [1]   Record citations are to documents in the Electronic Case File ("ECF"); pinpoint citations
are to the ECF-generated page numbers at the tops of the documents.

1   Holdings.

2       The plaintiffs/counter-defendants move to dismiss five counterclaims: (3) breach of a non-

3   compete clause in their membership contracts; (6) trademark infringement for wrongful transfer of

4   the marks to Straw Hat IP Holdings, in violation of the Lanham Act, 15 U.S.C. § 1114(1)(A); (8)

5   trademark infringement by false representation of ownership and false registration with the U.S.

6   Patent and Trademark Office, in violation of § 1125(a)(1)(a); (10) dilution of the trademark by the

7   competing claim of ownership, in violation of § 1125(c); and (12) unfair competition, in violation

8   of California Business & Professions Code § 17200. (Motion, ECF No. 17.)

9       The court finds the motion suitable for determination without oral argument under Civil Local

10  Rule 7-1(b), dismisses claim 3 with leave to amend, and otherwise denies the motion to dismiss.

**STATEMENT**

**I. THE PARTIES**

13      Straw Hat Cooperative is both a named plaintiff and a named defendant/counter-claimant. That

14  is because the plaintiffs/counter-defendants and the defendants/counter-claimants each claim that

15  they are the rightful board of directors of Straw Hat Cooperative and are entitled to control its

16  assets (including its trademarks and other IP). This is the central issue for the claims that the

17  plaintiffs/counter-defendants move to dismiss. The next two sections describe the parties.

**A. The Plaintiffs/Counter-Defendants**

19      The plaintiffs/counter-defendants and the counter-claims against them are as follows:

| Name | Party (P, Counter-D) | Named in Counter-Claims |
|------|----------------------|-------------------------|
| Cole and Donna English | Counter-Ds | 3, 6, 8, 10, 12 |
| English & Sons, Inc. | P, Counter-D | 3, 6, 8, 10, 12 |
| Pizza Pierates, LLC | P, Counter-D | 3, 6, 8, 10, 12 |
| Formatts Enterprise, LLC | P, Counter-D | 3, 6, 8, 10, 12 |
| Mehrok Foods, Inc. | P, Counter-D | 3, 6, 8, 10, 12 |
| Mostafa Sehhat | P, Counter-D | 3, 6, 8, 10, 12 |
| Olga Sehhat | P, Counter-D | 3, 6, 8, 10, 12 |
| Straw Hat IP Holdings | P, Counter-D | 6, 8, 10, 12 |

*UNITED STATES DISTRICT COURT*
*For the Northern District of California*

**UNITED STATES DISTRICT COURT**
**For the Northern District of California**

| Straw Hat Cooperative | P, D, Counter-Claimant | no |

Except Straw Hat IP Holdings, the plaintiffs/counter-defendants are Cooperative members:

- Cole and Donna English are shareholders of Straw Hats Restaurants, Inc. and shareholders of English & Sons, which is a member of Straw Hat Cooperative and operates two Straw Hat restaurants in Williams and Yuba City, California.. (TAC ¶ 2; TACC ¶ 7.) They applied for permission in 2009 to operate a third restaurant in Live Oak, but Straw Hat Cooperative denied their application. (TACC ¶ 48.) They opened and operated it anyway from May 2010 to May 2013. (*Id.*) In August 2014, Cole was elected to the board of Straw Hat Restaurants. (TACC ¶ 20.) He is the managing director of Straw Hat IP Holdings, which was formed in May or June 2012. (TACC ¶17.)

- Until November 2012, Pizza Pierates was a member of Straw Hat Cooperative and operated a Straw Hat restaurant in Discovery Bay, California. (TACC ¶ 8  .)

- Formatts Enterprise is a member of Straw Hat Cooperative and operates a Straw Hat restaurant in Redmond, Oregon. (TACC ¶ 9.)

- Mehrok Foods, Inc. was a member of Straw Hat Cooperative and operated a now-closed Straw Hat Pizza restaurant in Stockton, California. (TACC ¶ 10.)

- Mostafa and Olga Sehhat share a membership in Straw Hat Cooperative and operate a Straw Hat Restaurant in Rancho Cordova, California. (TACC ¶ 11.)

**B.  The Defendants/Counter-Claimants**

They are as follows. (*See* TAC ¶¶ 9-16;  TACC ¶¶ 5-6, 16, 18.)

| Name | Party (D, Counter-C) | Role |
|------|----------------------|------|
| Straw Hat Restaurants, Inc. | D, Counter-Claimant | Franchiser of Pizza Hat restaurants |
| Deborah Morris | D | Board Director of Straw Hat Cooperative |
| Jeffrey Eason | D | Board Director of Straw Hat Cooperative |
| Sal Listek | D | Board Director of Straw Hat Cooperative |
| Clark Rupp | D | Board Director of Straw Hat Cooperative |

| Randy Wise | D | Board Director of Straw Hat Cooperative |
|---|---|---|
| Allen Strege | D | CEO of Straw Hat Cooperative |
| Straw Hat Cooperative | D, Counter-Claimant | Cooperative Corporation |

**II. THE STRAW HAT ENTITIES AND THE INITIAL COMPLAINT**

From 1981 until 2008, members of Straw Hat Cooperative owned and operated all Straw Hat restaurants. (TACC ¶ 13.) In 2006, Straw Hat Cooperative's Board of Directors authorized the formation of Straw Hat Restaurants. (TAC ¶ 39.) In 2008, Straw Hat Restaurants "was organized to expand and enhance the Straw Hat brand" primarily by franchising the Straw Hat restaurants to individuals and entities. (TACC ¶13.) From 2008 until 2011, Straw Hat Cooperative and Straw Hat Restaurants operated a dual system: Straw Hat Cooperative members operated their restaurants under Straw Hat Cooperative's Amended Bylaws and their Member Agreements, and Straw Hat Restaurants' franchisees operated their restaurants under their franchise agreements. (*Id*. ¶ 14)

In May 2011, the Straw Hat Cooperative Board "proposed a ballot measure to windup and dissolve the cooperative corporation and to permit members to obtain shares in [Straw Hat Restaurants] as [] franchises on favorable terms." (TACC ¶¶ 15, 49.) On May 1, 2011, all Cooperative members (including the plaintiffs/counter-defendants) received a ballot to vote "for," "against," or "abstain" as to the following proposition:

Motion to voluntarily wind up and dissolve SHCC [Straw Hat Cooperative], to authorize and direct the Officers and Directors of SHCC to file a certificate evidencing the election to wind up and dissolve, as required by Section 12631 of the California Corporations Code, and to take such further action as may be necessary or convenient to windup and dissolve SHCC including the disposal of certain assets and interests of SHCC by doing all of the following:

(A) Transferring all intellectual property rights of SHCC including ownership of all trademarks, copyrights and trade secrets to Straw Hat Restaurants, Inc. ("SHRI") in exchange for payment of debt or for fair value; and

(B) Offering SHCC members the choice of the following options:

(i) Receiving the distributions the member would be entitled to receive upon the dissolution of SHCC under the Bylaws and California law; or

(ii) Assigning the member's membership in SHCC to SHRI and offering those members who choose to assign their membership to SHRI and who choose to enter into a franchise agreement with SHRI the following in lieu of the distributions those members would be entitled to receive upon the dissolution of SHCC under the Bylaws and California law:

(a) a guaranteed 1.75% in perpetuity combined royalty and advertising/marketing fee for each franchised business, even if the franchised business is sold.

(b) a guaranteed 1.75% in perpetuity combined royalty and advertising/marketing fee and a franchise fee of $5,000/location on up to two (2) additional franchised businesses, provided that the former SHCC member is the owner of 100% of the interest in such businesses and owns them for a minimum of five (5) years or assigns to their children.

(TACC ¶ 50.)

On June 15, 2011, 23 Cooperative members voted to wind up and dissolve Straw Hat Cooperative, and 15 voted against it. (*Id.* ¶ 51.) This quorum complied with the bylaws. (*Id.*)

Subsequently, only English & Sons, Pizza Pierates, Formatts, Mehrok and the Sehhats did not sign franchise agreements and continued to operate their restaurants under their Straw Hat Cooperative Membership Agreements. ( TAC ¶¶ 7, 53.) On October 19, 2011, they filed this lawsuit in state court challenging the dissolution of Straw Hat Cooperative. (TACC ¶ 53; *see* ECF No 1-1.)

### III.  THE 2012 BOARD MEETINGS AND THE TRANSFER OF IP

On April 5, 2012, the Straw Hat Cooperative (but not its individual members) "received a request for a special meeting from" plaintiffs/counter-defendants Cole English and Nick Harrison to address (1) removal of the board of directors, (2) election of a new board, (3) rescission of the voluntary election to windup and dissolve Straw Hat Cooperative, and (4) amendment of the bylaws to eliminate the appointment of two alternate directors to serve as directors upon the resignation, death, or removal of any director. (TACC ¶ 54.) "In response, on April 20, 2012," and in compliance with the Cooperative's bylaws, Straw Hat Cooperative sent a Notice of Special Meeting to all Straw Hat Cooperative Members setting a meeting on July 5, 2012 at 9 a.m. at Straw Hat Cooperative's headquarters to address (1) the composition of the board of directors, (2) the voluntary election to wind up and dissolve Straw Hat Cooperative and replace it with Straw Hat Restaurants, and (3) the amendment of the bylaws. (*Id.* ¶ 55.)

"[O]n May 8, 2012, the [Straw Hat Cooperative] (but not its members) received a Notice of Special Meeting dated May 7, 2012, and signed by Cole English and Nick Harrison" setting a meeting for May 17, 2012 to address (1) the notice of the May 7, 2012 meeting, (2) the removal of the board, (3) the election of a new board consisting of Cole English, Nick Harrison, Randy

1    Matthews, Gary Mehrok, and Olga Sehhat, (4) recission of the election to wind up and dissolve

2    Straw Hat Cooperative, and (5) to revise the bylaws to eliminate the alternate directors. (*Id.* ¶ 57.)

3       The plaintiffs/counter-defendants held their meeting on May 17, 2012. (*See* Opposition, ECF No.

4    21 at 7 (citations omitted).) The counter-complaint alleges this about the meeting:

5       Based upon information and belief, the SHCC Counter-Defendants, without valid or lawful

6    notice to any other SHCC members, gathered at the office of Pizza Pierates and conducted a
     purported meeting of SHCC members. Only the dissident SHCC Counter-Defendants were
7    permitted to vote despite the fact that none was in good standing or eligible to vote. Even though
     other non-delinquent members of SHCC who were in good standing were present, having
8    informally learned about the meeting, they were not allowed to participate in the vote. The
     SHCC Counter-Defendants, over objection, held a vote without a quorum, without proper notice,
9    and unilaterally acted upon their agenda. Not only was the purported meeting a nullity in light of
     SHCC's Notice of Special Meeting set for July 5, 2012 and because the purported meeting did
10   not comply with SHCC's Bylaws, but all of the supposed voting members were then in arrears
     and thus not in good standing and ineligible to vote. After the vote, SHCC Counter-Defendants,
11   through their own hired attorney, knowingly and falsely claimed that they were the Directors of
     SHCC, with Cole English as the acting President of SHCC, and that individuals other than the
12   Plaintiffs were not authorized to act on behalf of SHCC.

13   (TACC ¶ 60.)

14      At the meeting, then, the plaintiffs/counter-defendants "removed" the Cooperative board

15   directors (and named defendants) Deborah Morris, Jeffrey Eason, Sal Listek, Clark Rupp, and

16   Randy Wise, and "elected" Cole English, Nick Harrison, Randy Matthews, Gary Mehrok, and Olga

17   Sehhat as the new board of directors. (TAC ¶ 55.)

18      In May or June 2012, the "Counter-Defendants formed [Straw Hat IP Holdings] . . . with Cole

19   English as the managing member, for the inequitable and unjust purpose of transferring [Straw Hat

20   Cooperative's] intellectual property, including the Straw Hat trademarks . . . to [Straw Hat IP

21   Holdings] for no consideration." (TACC ¶¶ 17, 61.) The plaintiffs/counter-defendants "attempted

22   and purported to transfer a minimum of . . . seven (7) Marks owned by [Straw Hat Cooperative] and

23   licensed to [Straw Hat Restaurants], to [Straw Hat IP Holdings] without adequate consideration."

24   (TACC ¶ 62.) "In purporting to transfer Marks with serial numbers 78967523, 76378122,

25   76376553,763170773, 73214150, 73144985 and 73142974 SHIPH, Counter-Defendants and each

26   of them have sought to deprive other persons and entities operating Straw Hat Pizza Restaurants of

27   the full use and value of the Marks and business benefits thereof." (TACC ¶ 63.)

28      After the May 2012 election, the defendants/counter-claimants moved for a preliminary

UNITED STATES DISTRICT COURT
For the Northern District of California

injunction in state court to prohibit the plaintiffs/counter-defendants from taking any action as the Cooperative's board of directors. The state court granted it on August 29, 2012, finding that the plaintiffs had not produced evidence to contradict CEO Allen Strege's declaration that there were 37 Cooperative members: "Plaintiffs allege that many of these members are no longer members . . . but they have produced no evidence . . . to prove this allegation." (ECF No. 1-3 at 2-3, 7.) On January 7, 2015, the state court dissolved the injunction, finding that the plaintiffs had introduced new material facts supporting their contention that only six Straw Hat Cooperative members remained at the time the May 17, 2012 meeting took place. (ECF No. 1-13 at 5-6.)

## IV. OTHER ALLEGATIONS ABOUT THE INTELLECTUAL PROPERTY

Straw Hat Cooperative and Straw Hat Restaurants "have spent substantial time, money, and effort in developing consumer recognition and awareness of the Straw Hat Pizza mark" and "have spent significant amounts of money on print and internet advertising in order to inform consumers of the Straw Hat pizza mark." (TACC ¶ 34.) "Through extensive use of the Straw Hat Pizza mark, [they] have built up and developed significant goodwill in their entire product line . . . [and] have advertised the Straw Hat Pizza mark in a wide array of media. . . . (*Id.*) They are the exclusive owners of the Straw Hat Pizza registered marks and trade and service marks historically used by them in association with Straw Hat Restaurants. (*Id.*, listing marks.)

## V. BYLAWS, LICENSING AGREEMENT, AND MEMBERSHIP AGREEMENTS

The parties cite three documents that implicate their legal obligations: the Straw Hat Cooperative's bylaws, the licensing agreement about the use of the marks, and the membership agreements for Cooperative members.

### A. Straw Hat Cooperative's Bylaws

The 2008 Straw Hat Cooperative Amended Bylaws are Exhibit A to the TACC. (*See* ECF No. 15-1.) The parties identify the following relevant sections.

> Article II, Section 1: <u>Eligibility</u>. A Membership may only be owned by a person who owns and operates a restaurant under the name "Straw Hat." . . . Each Membership shall have the right to vote as set forth in section 2 of this Article II, for the election of directors and on disposition of substantially all the assets of the corporation and on the merger or dissolution of the corporation.

> Article II, Section 3: <u>Voting Rights</u>. . . .Members who are not in good standing shall not be entitled to vote on any matter.

UNITED STATES DISTRICT COURT
For the Northern District of California

Article II, Section 6. <u>Good Standing</u>. Any Member in arrears in the payment of obligations under the Agreement for more than thirty (30) days after their due date shall not be in good standing and shall not be entitled to vote his Membership.

Article III, Section 1. <u>Powers</u>. Subject to the limitations of the Articles of these Bylaws and of the Consumer Cooperative Corporation Law relating to action required to be approved by the Members or by a majority of the Members, the activities and affairs of the Corporation shall be conducted and all corporate powers shall be exercised by or under the direction of the

Board. The Board may delegate the management of activities of the corporation to any person or persons or committees however composed, provided that the activities and affairs of the corporation shall be managed and all corporate powers shall be exercised under the ultimate direction of the Board.

Article VII, Section 3: <u>Sale or Conversion of Existing Restaurants</u>: A Member may sell, transfer or convert a restaurant into a Franchise. If the Member chooses to convert the store into Franchise, then such action will cause that Member to lose that share of the Corporation associated

Article VIII, Section 1: <u>Purpose of the Corporation</u>. "The primary purpose of this Corporation shall be and shall remain the provision of benefits for its Members and the preservation and promotion of the name and goodwill associated with Straw Hat.

(ECF No. 15-1 at 2-3,  6, 14-5.)

**B. The Licensing Agreement**

Under its "Bylaws and a separate System License Agreement dated October 27," 2008,[2] Straw Hat Cooperative licensed to Straw Hat Restaurants the "use of the following intellectual property and other assets of the Corporation that the Board of Directors deem necessary and appropriate for use by [Straw Hat Restaurants] in performing its services of the Corporation, including, but not limited to, the following: the Corporation's logo, trademarks, other intellectual property, systems, processes, and procedures." (TACC ¶ 39.) (The plaintiffs/counter-defendants allege that they, as the new Straw Hat Cooperative Board, terminated the System License Agreement for cause in May 2012. (TAC  ¶ ¶ 9, 44.)) The Agreement has the following sections.

**1. LICENSE GRANT**

A. LICENSOR [Straw Hat Cooperative] hereby grants to LICENSEE [Straw Hat Restaurants] for the term of this Agreement, as recited in Schedule A[3] attached hereto, the exclusive right and

---

[2] The TACC lists the date as October 27, 2011, but the date on the agreement is October 7, 2008. (TACC ¶ 39; Agreement, ECF No. 21-4.)

[3] Schedule A allowed Straw Hat Cooperative members to operate their existing restaurants. (*See* Reply, ECF No. 22 at 11, quoting Schedule A.)

license, except as provided in Schedule A, to use, sell, distribute, franchise and advertise the System and all Licensed Products (derived therefrom) in the Territory. The license includes, but is not limited to, a license under any and all patents, trademarks and copyrights and any applications therefore which have been filed or may be filed in the future with respect to the System.

\*   \*   \*

## 2. TERM OF THE [LICENSING] AGREEMENT

This Agreement and the provisions hereof, except as otherwise provided, shall be in full force and effect commencing on the date of execution by both parties and shall extend perpetually, unless terminated under one of the provisions herein.

\*   \*   \*

## 14. INFRINGEMENTS

A.  LICENSEE shall have the right, in its discretion, to institute and prosecute lawsuits against third persons for infringement of the rights licensed in this Agreement.

(System License Agreement, ECF No. 21-4 at 2-3, 7.) The agreement provides for payment of an annual fee of $50,000, and it sets forth a scheme governing IP whereby the licensor Straw Hat Cooperative retains the IP, the licensee Straw Hat Restaurants can enhance the IP and have IP ownership of those enhancements, and Straw Hats Cooperative must license in a new agreement any use of the enhancements. (*Id.* at 3-5.) It has termination provisions. (*Id.* at 6.)

### C.  Membership Agreements

The Membership Agreements for Cooperative members authorize the members to use the marks. (TACC ¶ 40 and Ex. B, Membership Agreement, ECF No. 15-2.) Each Cooperative member "has agreed and acknowledged" that Straw Hat Cooperative "has the exclusive rights to own, control, and license the use of the Marks." (TACC ¶ 43.) Each member agreed that with regard to the Marks,

You will not contest, or help anyone else contest, Our ownership of them; You have no individual right to them, or to any goodwill associated with them, now or in the future. You will not use any of Our Registered Marks together with any other word or symbol without Our prior written consent; and will not use them in any Business other than the Restaurant. You will not use the Marks as part of any URL, domain name, locator, link, metatag, search engine technique, email address, or otherwise on the Internet except as We license You.

(*Id.,* quoting Membership Agreement, Article VI, § D, ¶ 1, ECF No. 15-2 at 11-12.) The Agreement

1  provides that members can "'use Our Registered Marks only to Operate the Restaurant.'" (TACC ¶

2  46, quoting Membership Agreement, Article VI, § C, ¶ 1, ECF No. 15-2 at 10.)

3      The Membership Agreement requires Cooperative members to pay Straw Hat Cooperative

4  administrative fees (2%) and a marketing fee (.75%); a failure to pay fees results in delinquency

5  and a loss of voting rights. (TACC ¶ 45; Membership Agreement, Article VII,  ECF No. 15-1 at 15-

6  17.)

7      The Membership Agreement also has a covenant not to compete:

8      You, and the Personal Guarantors will not, during the term of this Agreement, on Your own
       account or as an employee, agent, consultant, partner, officer, director, or shareholder of any
9      other person, firm, entity, partnership, limited liability company, or corporation, own, operate,
       lease, franchise, conduct, engage in, be connected with, have any interest in, or assist any person
10     or entity engaged in any business involving the production, service, or sale of pizza products, or
       any other related business that is competitive with or similar to a Straw Hat Pizza restaurant or
11     outlet, except with Our prior written consent.

12   (TACC ¶ 44; Membership Agreement, Article VI, § G, ECF No. 15-2 at 14-15.)

13  **VI.  OTHER RELEVANT PROCEDURAL HISTORY**

14      As described in Section II, the plaintiffs filed their lawsuit in October 2011, after a majority of

15  members voted to wind up and dissolve Straw Hat Cooperative. (TACC  ¶ 53.) The lawsuit

16  involved several rounds of complaints and counter-complaints, and in 2015 — after the

17  plaintiffs/counter-defendants added a claim of trademark infringement of the Straw Hat mark in

18  violation of 15 U.S.C. § 1114(1)(a) — the defendants/counter-claimants removed the case to

19  federal court. (3/25/15 Notice of Removal, ECF No. 1.) The parties consented to magistrate-judge

20  jurisdiction. (ECF Nos. 10, 11.) The operative complaints are the TAC and the TACC.

21      **A. The Third Amended Complaint**

22      The plaintiffs sued Straw Hat Restaurants and Straw Hats Cooperative (and its CEO Allen Strege

23  and the five Cooperative board directors), asking for declaratory relief declaring their rights

24  regarding the Straw Hat Cooperative (in claim 6) and alleging six additional claims (claims 1

25  through 5 and 7): (1) breach of fiduciary duty by the five directors during the transition to the

26  franchise business model; (2) a right to inspect Straw Hat Cooperative's records; (3) a right to

27  inspect Straw Hat Restaurant's records; (4) conversion (on the ground that rebates belong to Straw

28  Hat Cooperative and not to Straw Hat Restaurant, Inc.); (5) a similar restitution claim titled "Money

Had and Received"; and (7) trademark infringement in violation of 15 U.S.C. § 1114(a), because "Defendants are deceiving the public by offering their products and restaurant services under the Straw Hat Pizza trademarks, which are counterfeits "of those registered to and owned by Straw Hat" IP Holdings. (TAC, ECF No. 1-14, ¶¶ 91, 93.)

**B. The Third Amended Counter-Complaint**

The TACC has the following claims:

| # | Claim | Defendants |
|---|-------|-----------|
| 1 | Breach of Fiduciary Duty as Straw Hat Restaurants Board Member | Cole English |
| 2 | Aiding and Abetting claim 1 | All but Cole English |
| 3 | Breach of the Covenant Not to Compete | All but Straw Hat IP |
| 4 | Breach of Membership Agreement by not paying financial obligations, voting while delinquent, and using IP | All but Straw Hat IP |
| 5 | Breach of Membership Agreements (Live Oak restaurant) | Cole and Donna English |
| 6 | Trademark Infringement by transfer to Straw Hat IP Holdings | All |
| 7 | Trademark Infringement (Live Oak restaurant) | Cole and Donna English |
| 8 | False Designation of Marks by claiming ownership and registering them with the USPTO | All |
| 9 | False Designation of Marks (Live Oak restaurant) | Cole and Donna English |
| 10 | Trademark Dilution by the competing claim of ownership | All |
| 11 | Trademark Dilution (Live Oak Restaurant) | Cole and Donna English |
| 12 | UCL, Cal. Bus. & Prof Code § 17200 | All |
| 13 | UCL (Live Oak restaurant) | Cole and Donna English |
| 14 | Unjust Enrichment | All |
| 15 | Unjust Enrichment (Live Oak restaurant) | Cole and Donna English |
| 16 | Declaratory Relief For May 17, 2012 Vote | All |
| 17 | Declaratory Relief that true Board is Eason, Listek, Morris, Rupp, and Wise | All |
| 18 | Declaratory Relief that June 15, 2011 dissolution was legitimate | All |
| 19 | Declaratory Relief for ownership of IP | All |

| 20 | Declaratory Relief that Nick Harrison and Pizza Pierates are no longer members of Straw Hat Cooperative | All |
| 21 | Intentional Interference with Prospective Economic Advantage | All |
| 22 | Disgorgement and Constructive Trust | All |
| 23 | Conversion of assets through Straw Hat IP Holdings | All |

(TACC, ECF No. 15, at 18-37.)

The plaintiffs/counter-defendants move to dismiss claims 3, 6, 8, 10, and 12. (Motion, ECF No. 17.) These claims were in the first amended counter-complaint ("FACC") and second amended counter-complaint ("SACC"). (Opposition, ECF No. 21 at 9-10.) The state court rejected the plaintiffs/counter-defendants' arguments to dismiss the claims for all claims except claim 3 (then cause of action 20 in the FACC); it overruled their demurrer to the FACC except that it sustained the demurrer for claim 3 (cause of action 20) with leave to amend. (*Id.*))

## ANALYSIS

### I. PRIOR STATE COURT RULINGS

The counter-claimants first argue that the court should not overturn the state court's rulings on the same arguments. (Opposition, ECF No. 21 at 11.) The TACC supersedes the prior complaint and "renders it without legal effect." *Lacey v. Maricopa Cnty.,* 693 F.3d 896, 927 (9th Cir. 2012) (en banc); *see Ferdik v. Bonzelet*, 963 F.2d 1258, 1262 (9th Cir. 1992) (same). In this situation, federal courts have permitted defendants to challenge the entire amended complaint, including those claims that the courts previously found sufficient. *See O'Connor v. Uber Techns., Inc.*, 58 F. Supp. 3d 989, 995-96 (N.D. Cal. Sept. 4, 2014) (collecting cases). Applying federal procedural rules, the court addresses the arguments in the motion.

### II. MOTION TO DISMISS

#### A. Legal Standard

Federal Rule of Civil Procedure 8(a)(2) requires only a "short and plain statement of the claim showing that the plaintiff is entitled to relief . . . [to] give the defendant fair notice of what the . . . claim is and the grounds upon which it rests." *See Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 554 (2007). A court may dismiss a complaint under Federal Rule of Civil Procedure 12(b)(6) when it does

not contain enough facts to state a claim to relief that is plausible on its face. *See id.* at 570. "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal,* 129 S. Ct. 1937, 1949 (2009)."The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Id.* (quoting *Twombly*, 550 U.S. at 557.)."While a complaint attacked by a Rule 12(b)(6) motion to dismiss does not need detailed factual allegations, a plaintiff's obligation to provide the 'grounds' of his 'entitle[ment] to relief' requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do. Factual allegations must be enough to raise a right to relief above the speculative level." *Twombly,* 550 U.S. at 555 (citations and parentheticals omitted).

In considering a motion to dismiss, a court must accept all of the non-moving party's allegations as true and construe them in the light most favorable to the non-moving party. *See id.* at 550; *Erickson v. Pardus*, 551 U.S. 89, 93-94 (2007); *Vasquez v. Los Angeles County*, 487 F.3d 1246, 1249 (9th Cir. 2007). Courts may consider documents attached to the complaint without converting the motion into a summary-judgment motion. *See Parks School of Business, Inc. v. Symington*, 51 F.3d 1480, 1484 (9th Cir. 1995); *Knievel v. ESPN*, 393 F.3d 1068, 1076 (9th Cir. 2005). Courts may also consider a matter that is properly the subject of judicial notice, such as matters of public record. *See Lee v. City of Lost Angeles*, 250 F.3d 668, 688 (9th Cir. 2001).[4]

If a court dismisses the complaint, it must grant leave to amend even if no request to amend is made "unless it determines that the pleading could not possibly be cured by the allegation of other facts." *Lopez v. Smith*, 203 F3d 1122, 11127 (9th Cir. 2000) (quotation omitted).

**B. The Claims**

### *1. Claim 3: Breach of the Covenant Not to Compete*

In Claim 3, the counter-claimants claim that by transferring IP to Straw Hat IP Holdings, the

---

[4] The court grants the defendants/counter-claimants' request to take judicial notice of state-court records to show the procedural history. (ECF No. 21-9 at 5.) Because they are public records, the court may take judicial notice of the undisputed facts in them. *See Hotel Employees & Rest. Employees Local 2 v. Vista Inn Mgmt. Co.*, 393 F. Supp. 2d 972, 978 (N.D. Cal. 2005); Fed. R. Evid. 201(b); s*ee also Fontenot v. Wells Fargo Bank, N.A.*, 198 Cal. App. 4th 256, 264-67 (2011).

counter-defendants breached a non-compete clause in their membership agreements. (TACC ¶¶ 80-83.) The counter-defendants argue that this does not state a claim because the non-compete clause prohibits only competing by the equivalent of selling pizzas, not the transfer of IP. (Motion, ECF No. 17 at 12-13.) The court agrees that the counter-claimants do not state a claim.

Claim 3 incorporates by reference the facts summarized in the Statement, *supra*, and has these additional paragraphs:

> 81.  As a term of their Membership Agreements, the [Straw Hat Cooperative] Counter-Defendants including each of the members of [Straw Hat IP Holdings] who are also members of [Straw Hat Cooperative], agreed not to engage in conduct or business competitive with Straw Hat business operations.

> 82.  The [Straw Hat Cooperative] Counter-Defendants' formation of [Straw Hat IP Holdings], and efforts to usurp the Straw Hat proprietary information and intellectual property including the Marks associated with the brand and their value from other operators of Straw Hat Pizza establishments is in direct contravention of this contract term and their acknowledgment in entering into the contract that the exclusive right to own, control and license use of the Marks remained with [Straw Hat Cooperative], or at its election.

This is the non-compete clause:

> You, and the Personal Guarantors will not, during the term of this Agreement, on Your own account or as an employee, agent, consultant, partner, officer, director, or shareholder of any other person, firm, entity, partnership, limited liability company, or corporation, own, operate, lease, franchise, conduct, engage in, be connected with, have any interest in, or assist any person or entity engaged in any business involving the production, service, or sale of pizza products, or any other related business that is competitive with or similar to a Straw Hat Pizza restaurant or outlet, except with Our prior written consent.

(TACC ¶ 44 and Membership Agreement, Article VI, § G, ECF No. 15-2 at 14-15.).

The counter-defendants argue that the counter-claimants do not state a claim. (Motion, ECF No. 17 at 12.) Stripped of extra words, they assert, the non-compete clause says, "You . . . will not . . . be connected with . . . any related business that is competitive with or similar to a Straw Hat Pizza restaurant . . . except with Our prior written consent." (*Id.*) The TACC does not allege that Straw Hat IP Holdings is a "business that is competitive with or similar to a Straw Hat Pizza restaurant." (*Id.* at 16-17.) And transferring the marks is not "competition with a Straw Hat restaurant" in the way selling pizzas is. (Reply, ECF No. 22 at 9.) Thus, "the text of the non-compete covenant cannot be reasonably construed to apply to transfer of the trademarks as though it were competition with a Straw Hat restaurant." (*Id.*)

The court agrees: the counter-claimants do not state a claim. The non-compete clause is about

1   conduct that is "competitive with or similar to" a Straw Hat Pizza restaurant. The transfer of IP may

2   be an unauthorized transaction that forms the basis for other claims in the TACC. (*See, e.g.,* TACC

3   claim 4.) But the unauthorized transaction is not plausibly a violation of the non-compete clause's

4   prohibition against competing with Straw Hat pizza restaurants.

5        The counter-claimants nonetheless argue that forming an entity that is branded "Straw Hat" for

6   "the improper purpose" of diverting and converting the Straw Hat Cooperative's IP assets *is*

7   competing for the right to control and manage the IP. (Opposition, ECF No. 21 at 12-13.) They allege

8   as relevant the counter-defendants' acknowledgment in the membership agreements that only Straw

9   Hat Cooperative could control the Marks. (TACC ¶ 82.) This does not change the conclusion that the

10  assignment of the IP is not obviously a violation of the non-compete clause's prohibition against

11  competing with Straw Hat Pizza restaurants.

12       The counter-claimants note that controlling the IP covers more than the marks; it includes menus,

13  recipes, signage, and other elements that make up the Straw Hat system. (Opposition, ECF No. 21 at

14  13.) Diverting these, they assert, violates the covenant not to compete. (*Id.*) It might be that diverting

15  IP gives the counter-defendants some business outcome that violates the non-compete clause because

16  the conduct is "competitive . . . with a Straw Hat Pizza restaurant. . . ." (Membership Agreement,

17  Article VI, § G.) That theory is not alleged, and the court thinks that the facts in paragraphs 1 through

18  79 of the TACC (incorporated by reference in claim 3) do not give "fair notice" of a claim that rests

19  on this theory. *See Twombly*, 550 U.S. at 555. The court dismisses claim 3 with leave to amend.

20       The counter-defendants also argue that the non-compete clause violates California Business and

21  Professions Code § 16600. (Motion, ECF No. 17 at 13.) The counter-claimants respond that their

22  intent is to prevent misappropriation of IP, not prevent operation of a lawful business, and thus the

23  claim does not implicate section 16600. (Opposition, ECF No. 21 at 13.) The court does not need to

24  decide the issue because it holds that the non-compete clause does not reach the transfer of the IP.

25       ***2. Claim 6: Trademark Infringement by the Transfer of Marks to Straw Hat IP Holdings***

26       In claim 6, the counter-claimants claim that by transferring the Straw Hat Marks to Straw Hat IP

27  Holdings, the counter-defendants committed trademark infringement in violation of the Lanham Act,

28  15 U.S.C. § 1114(1)(a). (TACC ¶¶ 99-103.) The counter-defendants argue that the counter-claimants

1  do not state a claim because they do not allege any commercial use of the trademarks other than

2  licensed use for the Straw Hat Restaurants. (Motion, ECF No. 17 at 14-15.)[5] The court denies the

3  motion to dismiss claim 6 because the counter-claimants plausibly alleged commercial use and the

4  potential for confusion.

5      15 U.S.C. § 1114(1)(a) provides:

6  (1) Any person who shall, without the consent of the registrant –

7  (a) use in commerce any reproduction, counterfeit, copy or colorable imitation of a registered

    mark in connection with the sale, offering for sale, distribution, or advertising of any goods or

8      services on or in connection with which such use is likely to cause confusion, or to cause

    mistake, or to deceive; []

9                           *   *   *

10  shall be liable in a civil action by the registrant for the remedies hereinafter provided.

11

12  15 U.S.C. § 1114(1)(a).

13      The elements of trademark infringement are (1) a protectible ownership interest in a trademark,

14  and (2) the defendant's use of the mark creates a likelihood of consumer confusion. *See Network*

15  *Automation, Inc. v. Advanced Sys. Concepts, Inc.*, 638 F.3d 1137, 1144 (9th Cir. 2011). "The core

16  element of trademark infringement is the likelihood of confusion, *i.e.*, whether the similarity of the

17  marks is likely to confuse customers about the source of the products." *Abercrombie & Fitch Co. v.*

18  *Moose Creek, Inc.*, 486 F.3d 629, 633 (9th Cir. 2007). In determining whether there is a likelihood of

19  confusion, a court weighs the following factors: (1) the strength of the mark; (2) the proximity of the

20  goods; (3) the similarity of the marks; (4) evidence of actual confusion; (5) marketing channels used;

21  (6) type of goods and the degree of care likely to be exercised by the purchaser; (7) the defendant's

22  intent in selecting the mark; and (8) likelihood of expansion of the product lines. *See AMF Inc. v.*

23  *Sleekcraft Boats*, 599 F.2d 341, 348–49 (9th Cir. 1979).

24      The counter-defendants argue that the counter-claimants do not allege any commercial use of the

25  marks "without the consent of the registrant." (Motion, ECF No. 17 at 14.) The only use of the mark

26  in commerce is in connection with the operation of the restaurants, and that use is allowed by the

27

28       [5] Cole and Donna English used the trademarks in the unapproved Live Oaks restaurant, but
that is conduct addressed in claim 5. (*See* Motion, ECF No. 17 at 14 n.6 (making this point).)

UNITED STATES DISTRICT COURT
For the Northern District of California

membership agreements. (*Id.* at 14-15.) They assert that by definition, the licensed use of the mark cannot cause confusion or deception. (*Id.* at 15.) Moreover, they argue, the transfer to Straw Hat IP Holdings is not "use in commerce;" the allegation is only that the name "Straw Hat" appears in the entity name, and there is no allegation that Straw Hat IP Holdings engages in commercial activity that could cause consumer confusion. (Reply, ECF No. 22 at 9-10.) They conclude that the transfer may be illegal, but that conduct is addressed by other claims and does not amount to trademark infringement. (Motion, ECF No. 17 at 15.)

The counter-defendants' point is that this claim is about a transfer of IP to an entity that does not engage in any commercial activity, is not visible to the public, and therefore cannot create consumer confusion. But the counter-claimants allege more than this and thus plausibly state a claim. Claim 6 incorporates by reference the fact chronology summarized in the Statement, *supra*. (TACC ¶ 98.) That chronology establishes the core dispute in this case: who owns the marks, who can license them, and who can use them. The parties each allege that they have these rights, and they charge other with trademark infringement based on wrongful use of the marks in violation of § 1114(1)(a). For example, claim 7 in the TAC charges that the defendants/counter-claimants are deceiving the public by using the marks at Straw Hat restaurants, thus creating a likelihood of consumer confusion and deceiving the public. (TAC ¶¶ 91, 94-97.) Claim 6 in the TACC (when read in the context of the fact allegations) similarly claims trademark infringement by all plaintiffs/counter-defendants by unlawfully converting the marks, exceeding permissible use of the marks, and unlawfully claiming rights to control use of them. (TACC ¶¶ 46, 66,  101; *see* Opposition, ECF No. 21 at 15.) The TAC and the TACC both allege that this constitutes use of a counterfeit mark. (TAC ¶ 91; TACC ¶ 102.) In essence, both parties argue, "you do not control the marks but we do," and both argue that the others' actions have a financial impact and create customer confusion. Moreover, the plaintiffs/counter-defendants claim ownership of the marks to control (or prevent) use of them by the defendants/counter-defendants in their business. Indeed, they seek to vindicate that commercial interest by this lawsuit.

Considering these facts, the counter-claimants plausibly state a claim. They need not plead all evidence in support of their claims, and they need not plead "detailed factual allegations." *See*

UNITED STATES DISTRICT COURT
For the Northern District of California

1    *Twombly*, 550 U.S. at 555. They need only state a plausible claim and give "fair notice" of what the

2    claim is and the grounds upon which it rests." *Id.* The court denies the motion to dismiss claim 6.

3        The counter-defendants also argue that the TACC does not allege sufficiently that Straw Hat

4    Restaurants is the registrant of the marks and as a result, Straw Hat Restaurants lacks standing to

5    bring claim 6. (Motion, ECF No. 17 at 15-16.) The TACC sufficiently alleges facts about Straw Hat

6    Restaurant's protectible ownership interest in the marks. *See supra* Statement. For example, the

7    TACC alleges that Straw Hat Restaurants is the exclusive licensee with the right to prosecute lawsuits

8    for infringement. (TACC ¶ 39; *see* Statement, *supra*, quoting License Agreement, ECF No. 21-4 at

9    2.) The counter-defendants' citation to Schedule A of the License Agreement does not change this

10   conclusion. (Reply, ECF No. 22 at 11.) Schedule A allows the counter-defendants to maintain their

11   restaurants. It does not eliminate Straw Restaurants' claim of an otherwise exclusive license or its

12   standing to sue for trademark infringement.

13       ### 3. Claim 8: False Designation of Origin

14       In claim 8, the counter-claimants claim that by falsely claiming that they own the marks and by

15   registering them with the U.S. Patent and Trademark Office, the counter-defendants falsely

16   designated the origin of the marks, in violation of 15 U.S.C. § 1125(a)(1)(A). (TACC ¶ 110.) The

17   counter-defendants again argue that the counter-claimants do not state a claim because they do not

18   allege any commercial use other than licensed use at Cooperative members' Straw Hat restaurants.

19   (Motion, ECF No. 17 at 17.) The court denies the motion to dismiss claim 8, again because the

20   counter-claimants plausibly alleged commercial use and the potential for confusion.

21       15 U.S.C. § 1125(a)(1) provides:

22       Any person who, on or in connection with any goods or services, or any container for
         goods, uses in commerce any word, term, name, symbol, or device, or any
23       combination thereof, or any false designation of origin, false or misleading description
         of fact, or false or misleading representation of fact, which—
24
         (A) is likely to cause confusion, or to cause mistake, or to deceive as to the
25       affiliation, connection, or association of such person with another person, or as to
         the origin, sponsorship, or approval of his or her goods, services, or commercial
26       activities by another person, or

27                                              *   *   *

28       shall be liable in a civil action by any person who believes that he or she is or is likely
         to be damaged by such act.

To establish a claim for trademark infringement or false designation of origin under Section 1125(a)(1)(A), a plaintiff must prove that the defendant (1) used in commerce (2) any word, false designation of origin, false or misleading description, or representation of fact, which (3) is likely to cause confusion or mistake, or to deceive, as to sponsorship, affiliation, or the origin of the goods or services in question. *See Freecycle Network, Inc. v. Oey*, 505 F.3d 898, 902 (9th Cir. 2007)*; see also Int'l Order of Job's Daughters v. Lindeburg & Co.*, 633 F.2d 912, 917 (9th Cir. 1980) (claims under Section 1125(a)(1)(A), false designation of origin, or unfair competition may be proven by the same elements as common-law unfair competition, and the federal prohibitions on trademark infringement and false designation of origin each "preclude the use of another's trademark in a manner likely to confuse the public about the origin of goods") (citing *New West Corp. v. NYM Co. of California*, 595 F.2d 1194, 1201 (9th Cir. 1979) ("Whether we call the violation infringement, unfair competition or false designation of origin, the test is identical[:] [I]s there a 'likelihood of confusion?'")). "[L]ikelihood of confusion is determined by evaluating a variety of factors including the type of trademark at issue; similarity of design; similarity of product; identity of retail outlets and purchasers; identity of advertising media utilized; defendant's intent; and actual confusion." *Roto-Rooter Corp. v. O'Neal*, 513 F.2d 44, 45 (5th Cir. 1975)(footnotes omitted).

The counter-defendants reiterate their argument that the TACC alleges only licensed use of the marks by their restaurants, and that claim cannot constitute confusion. (Motion, ECF No. 17 at 17.) Otherwise, they assert, the TACC does not contain any factual allegations about any of the *Roto-Rooter* factors. (*Id.*) The court disagrees. As discussed in the previous section, the case is about who owns the marks and is entitled to use or license them. The parties each claim that the others' actions constitute use "in a manner likely to confuse the public about the origin of the goods." *Int'l Order of Job's Daughters v. Lindeburg*, 633 F.2d at 917. Given the detailed allegations in the complaint, the counter-claimants have given "fair notice" of the claim and the "grounds upon which it rests." *Twombly*, 550 U.S. at 555. The court denies the motion to dismiss claim 8.

### 4. Claim 10: Trademark Dilution

In claim 10, the counter-claimants claim that the counter-defendants' unlawful claim of ownership of the marks is trademark dilution in violation of 15 U.S.C. § 1125(c). (TACC ¶¶ 117-122.) The

UNITED STATES DISTRICT COURT
For the Northern District of California

1   counter-defendants again argue that the counter-claimants do not state a claim because they do not

2   allege any commercial use other than licensed use, and that cannot be dilution. (Motion, ECF No. 17

3   at 18-19.) The court denies the motion to dismiss claim 10 on the ground that the counter-claimants

4   adequately alleged use beyond licensed use.

5       15 U.S.C. § 1125(c) prohibits dilution by blurring and dilution by tarnishment:

6       (1) Injunctive relief

7       Subject to the principles of equity, the owner of a famous mark that is distinctive, inherently or

8        through acquired distinctiveness, shall be entitled to an injunction against another person who, at
    any time after the owner's mark has become famous, commences use of a mark or trade name in

9    commerce that is likely to cause dilution by blurring or dilution by tarnishment of the famous
    mark, regardless of the presence or absence of actual or likely confusion, of competition, or of

10   actual economic injury.

11      (2) Definitions

12                                    *    *    *

13      (B) For purposes of paragraph (1), "dilution by blurring" is association arising from the
    similarity between a mark or trade name and a famous mark that impairs the distinctiveness of

14   the famous mark. In determining whether a mark or trade name is likely to cause dilution by
    blurring, the court may consider all relevant factors, including the following:

15          (i) The degree of similarity between the mark or trade name and the famous mark.

16
            (ii) The degree of inherent or acquired distinctiveness of the famous mark.
17
            (iii) The extent to which the owner of the famous mark is engaging in substantially exclusive

18          use of the mark.

19
            (iv) The degree of recognition of the famous mark.
20
            (v) Whether the user of the mark or trade name intended to create an association with the

21          famous mark.

22          (vi) Any actual association between the mark or trade name and the famous mark.

23      (C) For purposes of paragraph (1), "dilution by tarnishment" is association arising from the
    similarity between a mark or trade name and a famous mark that harms the reputation of the

24   famous mark.

25      In denying the motion to dismiss claim 6, the court found that the counter-claimants plausibly

26   alleged use that exceeded permissible use. That conclusion applies here too. The counter-defendants

27   nonetheless argue that the plain language of the Membership Agreements establishes that they are

28   entitled to use the marks. (Reply, ECF No. 22 at 12.) The court disagrees. These are issues of fact to

1    be illuminated through discovery. The court denies the motion to dismiss claim 10.

2        *5. Claim 12: Unfair Competition*

3        In claim 12, the counter-claimants claim that the counter-defendants' actions are unlawful, unfair

4    and fraudulent business acts or practices that violate California's Unfair Competition Law ("UCL"),

5    Cal. Bus. & Prof. Code § 17200. (TACC ¶¶ 128-130.) The court denies the counter-defendants'

6    motion to dismiss claim 12.

7        The UCL prohibits any "unlawful, unfair or fraudulent business act or practice." Cal. Bus. & Prof.

8    Code § 17200. "[Because] section 17200 is [written] in the disjunctive, it establishes three separate

9    types of unfair competition. The statute prohibits practices that are either 'unfair' or 'unlawful,' or

10   'fraudulent.'" *Pastoria v. Nationwide Ins.*, 112 Cal. App. 4th 1490, 1496 (2003); *see also Cel–Tech*

11   *Communications, Inc. v. Los Angeles Cellular Tel. Co.*, 20 Cal. 4th 163, 180 (1999).

12       The UCL incorporates other laws and treats violations of those laws as unlawful business practices

13   independently actionable under state law. *Chabner v. United Omaha Life Ins. Co.*, 225 F.3d 1042,

14   1048 (9th Cir. 2000). Violation of almost any federal, state, or local law may serve as the basis for a

15   UCL claim. *Saunders v. Superior Court*, 27 Cal. App. 4th 832, 838-39 (1994). In addition, a business

16   practice may be "unfair or fraudulent in violation of the UCL even if the practice does not violate any

17   law." *Olszewski v. Scripps Health*, 30 Cal. 4th 798, 827 (2003).

18       *a. "Unlawful" claim*

19       The court previously found that the counter-claimants plausibly alleged the Lanham Act claims.

20   These are predicate claims that support a claim under the "unlawful" prong of the UCL. *Finiular v.*

21   *BAC Home Loans Servicing, L.P.*, No. 3:11-cv-02629-JCS, 2011 WL 4405659, at *9 (N.D. Cal. Sep.

22   21, 2011) (citing *People v. McKale*, 25 Cal.3d 626, 635 (1979)).

23       *b. "Fraudulent" claim*

24       In denying the motion to dismiss claims 6, 8, and 10, the court necessarily found that the counter-

25   claimants alleged with sufficient particularity that the public (as opposed to a corporate competitor)

26   likely would be deceived or confused by the similarity of the marks. *See Capella Photonics, Inc. v.*

27   *Cisco Systems, Inc.*, No.3:14-cv-03348-EMC, 2014 WL 8097683, at *11 (N.D. Cal., Dec. 23, 2014)

28   (under the UCL, "a corporate-competitor 'is not entitled to the protection of [the fraudulent] prong of

§17200 because it is not a member of the public or a consumer entitled to such protection"); *Finuliar*, 2011 WL 4405659, at *10 ("to state a claim under the UCL based on fraudulent conduct, [a p]laintiff must allege, with particularity, facts sufficient to establish that the public would likely be deceived by Defendants' conduct.")

### c. *"Unfair" claim*

This case involves business competitors. Thus, to state an "unfair" claim under the UCL, the alleged unfairness must "be tethered to some legislatively declared policy or proof of some actual or threatened impact on competition." *Cel–Tech Communications, Inc. v. L.A. Cellular Tel. Co.*, 20 Cal.4th 163, 186-187 (1999). In business-competitor claims, "the word 'unfair' . . . means conduct that threatens an incipient violation of an antitrust law, or violates the policy or spirit of one of those laws because its effects are comparable to or the same as a violation of the law, or otherwise significantly threatens or harms competition. *Levitt v. Yelp! Inc.*, 765 F.3d 1123, 1136 (9th Cir. 2014) The Ninth Circuit has held that Lanham Act claims are "substantially congruent" to state claims of unfair competition. *See Cleary v. NewsCorp.*, 30 F.3d 1255, 1262-63 (9th Cir. 1994) (citations omitted). The counter-claimants state an "unfair" claim.

**CONCLUSION**

The court grants in part and denies in part the plaintiffs/counter-defendants' motion to dismiss. The court dismisses claim 3 without prejudice and denies the motion to dismiss claims 6, 8, 10, and 12. The defendants/counter-claimants must file any amended complaint within 14 days. This disposes of ECF No. 17.

**IT IS SO ORDERED.**

Dated: July 11, 2015

_____
LAUREL BEELER
United States Magistrate Judge

**UNITED STATES DISTRICT COURT**
For the Northern District of California