1

2

3

4

5

6

7

8                          UNITED STATES DISTRICT COURT

9                          NORTHERN DISTRICT OF CALIFORNIA

10                               San Francisco Division

11

12    ENGLISH & SONS, INC., et al.,              Case No.15-cv-01382-LB

            Plaintiffs,

13

14          v.                                   **SUMMARY-JUDGMENT
                                                 ORDER**
      STRAW HAT RESTAURANTS, INC., et al.,
15                                               [Re: ECF Nos. 55, 60, 61]
            Defendants.

16

17                                   **INTRODUCTION**

18          This case involves a falling out among members of the Straw Hat Pizza restaurant chain. The

19    plaintiffs are those members of the Straw Hat chain who dissented from a majority vote to dissolve

20    the existing company and move Straw Hat from a cooperative to a franchise model. The

21    defendants are Straw Hat members who either voted to dissolve the company, or at least honored

22    the results of that vote, and converted their restaurants into Straw Hat franchises. The parties'

23    essential dispute is over who has the right to control the cooperative (the entity that elected to

24    dissolve itself) and its assets — especially its intellectual property (like trademarks, operating

25    manuals, recipes, and so on). The parties have filed a series of summary-judgment motions on

26    many (though not all) of their respective claims and counterclaims. The court's central holding is

27    that, as a matter of law, the plaintiffs had no power after the June 2011 dissolution vote to decide

28    that they were the cooperative's "only remaining members," or to take the actions that they did:

such as electing a new board of directors, revoking the dissolution vote, and transferring the company's intellectual property to a new entity that only they controlled. The court holds that all such acts by the plaintiffs are null. The court orders the plaintiffs to roll back everything that they did as a putatively revamped cooperative after June 2011; holds that the cooperative's duly authorized board of directors is the board as constituted on June 15, 2011; and directs the parties to inform the court of the practical steps that are needed to restore the previous status quo. The court sets out below its holdings on the parties' specific claims.

## STATEMENT

### 1.  Introduction: The parties and the basic dispute

The material facts of this case are undisputed. Indeed, almost all the facts of this case are undisputed. This lawsuit is not about factual disagreement so much as the legal effects of the parties' acts. This case involves a dispute among members of the Straw Hat Pizza restaurant chain. Since 1987, Straw Hat restaurants have operated as individual members of Straw Hat Cooperative Corporation ("SHCC"). In June 2011, a majority of SHCC's members voted to dissolve the cooperative as part of changing the company's business model from a cooperative to a franchise system. A group of SHCC members who voted against dissolution — the six plaintiffs here[1] — challenged that decision. They sued to enjoin the dissolution and then, after concluding that they were the "only remaining members" of SHCC, purported to elect a new SHCC board of directors. This revamped SHCC voted to transfer its intellectual property to a new company that the plaintiffs had created for that purpose: Straw Hat Intellectual Property Holding LLC ("SHIPH").[2] SHIPH then recorded a notice of assignment with the U.S. Patent and Trademark Office

---

[1] When the court writes "the six plaintiffs," it means all the plaintiffs except SHCC and SHIPH. In other words, the six plaintiffs who own (or owned) Straw Hat restaurants: English & Sons, Inc.; Pizza Pierates, LLC; Formatts Enterprise, LLC; Mehrok Food, Inc.; Mostafa Sehhat; and Olga Sehhat.

[2] *See* C. English Dep. – ECF No. 60-43 at 7-8 (pp. 62-63) (SHIPH created to hold IP); ECF No. 60-44 at 46-50, 59-62 (assignments to SHIPH). Record citations throughout this order are to material in the Electronic Case File ("ECF"); pinpoint citations are to the ECF-generated page numbers at the top of documents. Cites to deposition pages will contain both an "at" preceding the *ECF*-generated page number and a parenthetical "p." reference to the deposition transcript's original pagination.

memorializing the purported transfer of the Straw Hat registered trademarks from SHCC to

SHIPH.[3] The present dispute asks whether the plaintiffs could rightly do what they did, and at its

core seeks to determine the legal status of SHCC and its property.

(This may be the best place to take care of some housekeeping. First, all the business entities

involved here are California companies. Second, SHCC is named as both a plaintiff and a

defendant in this case; both sides claim to be the rightful SHCC directors, with power to control

the company and its assets. Third, the relevant events here involve several corporate votes. No one

disputes the procedural validity of any such vote: no one argues that a ballot was flawed, for

example, or a vote wrongly counted. The parties challenge each other's acts on substantive legal

grounds, but the discussion need not bog down in the procedural aspects of the several corporate

votes.)

## 2.  Longstanding plans to change to a franchise model

It is undisputed that, before the falling out in 2011, SHCC had for some time considered a

move away from the cooperative structure to a franchise model. The parties describe franchising

as providing a vehicle for the Straw Hat chain to grow. To this end, in 2006 SHCC's board of

directors formed Straw Hat Restaurants, Inc. ("SHRI"), to serve as the franchisor company.[4] SHRI

began offering Straw Hat franchises two years later.[5]

In 2008, SHCC's members amended the cooperative's bylaws. Of the bylaws adopted in 2008,

the following two are among the most salient for present purposes. The first addresses how SHCC

members can convert to franchises under SHRI:

> **Sale or Conversion of Existing Restaurants.** A Member may sell, transfer or
> convert a restaurant to a Franchise. If the Member chooses to convert the store into
> a Franchise, then such action will cause that Member to lose that share of the
> [cooperative] Corporation associated with that restaurant.[6]

---

[3] Notice of Recordation of Assignment – ECF No. 60-44 at 56-58.

[4] *E.g.,* C. English Decl. – ECF No. 58 at 3 (¶ 9).

[5] *Id.* at 3 (¶ 11).

[6] *E.g.,* 2008 Bylaws – ECF No. 58-1 at 14.

The second ensures that SHRI — and, by extension, its franchisees — would be able to use Straw Hat's intellectual property:

> **Licenses.** The Corporation [*i.e.,* SHCC] shall license to SHRI . . . [the] intellectual property and other assets of [SHCC] . . . including, but not limited to . . . the Corporation's logo, trademarks, other intellectual property, systems, processes, and procedures.[7]

The defendants have produced the 2008 "System License Agreement" that apparently put this last bylaw into effect.[8] Under this agreement, SHCC granted SHRI a "perpetual[]" license to use the Straw Hat intellectual property in the franchise side of the business. More specifically, the license grants SHRI the use of, "All intellectual property . . . owned by [SHCC] and used in the operation of a Straw Hat [restaurant] . . ."; this principally included the "trademarks and service marks associated with Straw Hat Restaurants," "store manuals . . . describing the manner and method[] of building and operating a Straw Hat Restaurant," and the Internet domain name "strawhatpizza.com."[9] The plaintiffs "dispute the validity of [this] license,"[10] but that dispute is immaterial to the present analysis. The license is useful for showing (in more detail than the 2008 bylaw) the intended relationship between SHCC and the franchising SHRI side of the business. The license also shows — what no one really denies; and what other evidence equally proves — that, before the company's breakdown in 2011, everyone understood that SHCC owned the Straw Hat intellectual property.

### 3. The 2011 dissolution vote —  Members convert to SHRI franchises — The plaintiffs sue and then form a new SHCC — Events in 2012

This dispute grows most immediately from events that happened in and after June 2011. In that month, a majority of SHCC members voted to "voluntarily . . . wind up and dissolve SHCC."[11] Twenty-three of SHCC's 42 members voted to dissolve the cooperative.[12] (Fifteen members voted

---

[7] *Id.* at 15.

[8] System License Agreement – ECF No. 60-12.

[9] *Id.* at 3 ("perpetually"), 10 (describing licensed property).

[10] ECF No. 55 at 13.

[11] *See* Ballot – ECF No. 60-13 at 2-3; Ballot Tally – ECF No. 60-27 at 2-3.

[12] Ballot Tally – ECF No. 60-27 at 2-3.

United States District Court
Northern District of California

against dissolution, while three abstained or did not vote.[13]) The plaintiffs voted against dissolution.[14] The majority also voted to "transfer[] all intellectual[-]property rights of SHCC . . . to SHRI . . . in exchange for payment of debt or for fair value."[15] The June 2011 vote offered SHCC members two options: Either exit the dissolving cooperative — in which case the departing member would take the distribution that she "would be entitled to receive upon the dissolution of SHCC under the Bylaws and California law" — or convert to an SHRI franchise.[16]

By October 2011, all SHCC members except the six plaintiffs had converted to SHRI franchises.[17] It is undisputed that, by that October, SHCC was not fully dissolved. Despite the June 2011 vote, SHCC had not filed with the California Secretary of State a statutorily required "certificate evidencing [the] election" to dissolve. *See* Cal. Corps. Code § 12631. Nor had SHCC contracted with SHRI to transfer to the latter the Straw Hat intellectual property, as the June 2011 vote had contemplated. By October 2011, SHCC certainly had not finally distributed its assets.

That same month saw the plaintiffs sue SHCC, SHRI, and SHCC's directors in the Superior Court of Contra Costa County.[18] They sought to enjoin the dissolution, and have themselves installed as SHCC's directors, though they did not then claim that they were SHCC's "sole remaining members" under the 2008 bylaws.[19] Early 2012 brought that new tack. Citing the first bylaw reproduced above, the plaintiffs argued (as they do here) that, by converting to SHRI franchises, all the other SHCC members had given up their membership in the cooperative; this left the plaintiffs as SHCC's "sole remaining members."[20]

_____

[13] *Id.*

[14] *Id.* Strictly speaking, plaintiff Pizza Pierates, LLC voted *for* dissolving SHCC (*see id.*) but later joined the other plaintiffs in challenging that dissolution and putatively forming a new SHCC board.

[15] *E.g.,* Ballot – ECF No. 60-13 at 2.

[16] *E.g.*, *id.*

[17] *See* C. English Decl. – ECF No. 65 at 5 (¶ 23).

[18] Compl. on Removal – ECF No. 1-1.

[19] *See id.*, *passim*.

[20] *See, e.g.,* ECF No. 55 at 12-13, 17 (arguing that plaintiffs were "only remaining members of SHCC").

United States District Court
Northern District of California

United States District Court
Northern District of California

The plaintiffs then took several actions that are at the heart of this dispute. First, in May 2012, they elected a new SHCC board of directors. Purportedly ousting the board that had existed in June 2011, the plaintiffs elected Cole English, Nick Harrison, Randy Matthews, Gary Mehrok, and Olga Sehhat as the new directors of SHCC.[21] (These individuals being principals of the respective corporate plaintiffs.) Then, purportedly acting as SHCC, they "terminate[d]" "any license [that] might have existed" between SHCC and SHRI.[22] They voted to revoke the June 2011 dissolution vote.[23] They voted to dissolve the new SHCC and distribute to themselves the cooperative's assets.[24] They formed a new entity, SHIPH, and assigned to that entity the Straw Hat intellectual property.[25] More specifically, they purported to assign the following to SHIPH:

> [A]ll trademarks, service marks and trade secrets owned or used . . . in [the] business, including but not limited to the trade name STRAW HAT PIZZA . . . [;]

> [A]ll the . . . [Internet] domain names used in [the] business[; and]

> All . . . other intangible assets currently used exclusively in connection with the Straw Hat® restaurant business, including without limitation . . . all trade secrets, recipes, inventions, designs, copyrights, non-registered trademarks and other intellectual property, know-how, methods and processes.[26]

SHIPH then filed a notice of assignment with the U.S. Patent and Trademark Office, memorializing the purported transfer of the Straw Hat registered trademarks from SHCC to SPIPH.[27]

**4.  Facts related to the defendants' fiduciary-breach claim**

The court now turns to facts related to the parties' more ancillary claims. The first set of facts involves the defendants' claim that plaintiff Cole English breached a fiduciary duty when (for a

---

[21] *See id.*; C. English Decl. – ECF No. 58 at 5-6 (¶¶ 25-27); ECF No. 58-2 at 28-34 (exhibits).

[22] C. English Decl. – ECF No. 65 at 7 (¶ 39); ECF No. 65-4 at 5-6.

[23] *E.g.,* C. English Decl. – ECF No. 65 at 6 (¶ 33).

[24] *E.g., id.* at 7 (¶¶ 34, 36).

[25] *E.g., id.* at 7 (¶ 37); C. English Dep. – ECF No. 60-43 at 7-8 (pp. 62-63); ECF No. 60-44 at 46-50, 59-62.

[26] *E.g.,* ECF No. 60-44 at 62.

[27] *E.g.,* Notice of Recordation of Assignment – ECF No. 60-44 at 56-58.

United States District Court
Northern District of California

comparatively short time) he was a director of SHRI. The relevant facts are undisputed. Like "[m]any . . . [SHCC] members," as well as some SHRI employees, Mr. English had purchased SHRI stock under a private offering in 2008.[28] In August 2014, he was elected an SHRI director; he resigned that position in July 2015. He was therefore both an owner and principal of English and Sons and SHIPH, on the one hand, and, on the other, a director of SHRI when on February 23, 2015, the plaintiffs filed a Third Amended Complaint against SHRI in the California state-court action. Indeed, Mr. English has testified that he authorized the filing of the Third Amended Complaint against SHRI.[29]

There is consequently no factual dispute that, at least to this degree, Mr. English authorized claims against SHRI while he was serving as an SHRI director. Mr. English does not deny this. He does point out the following:

> At the SHRI Board first meeting I attended as a Director [of SHRI], I was informed that the Board would not discuss anything related to this suit or the Central District lawsuit in my presence. Neither suit was discussed with me or in my presence while I was on the Board.

> The Central District action was stayed when I was elected to the Board of SHRI and at the time that the members of SHIPH authorized the filing of the Third Amended Complaint in this action.[30]

These points too are undisputed.

Two other facts are relevant here. First, while he was an SHRI director, Mr. English approved the transfer of a Straw Hat restaurant to a new owner; this necessarily both required and allowed the new owner to use the Straw Hat marks.[31] (The SHRI board's minutes also show that "English made the motion to approve" certain terms of that transfer.[32]) Second, Mr. English testified that his authorizing an infringement claim against SHRI was "[p]robably not" to that company's benefit.[33]

---

[28] C. English Decl. – ECF No. 65 at 3, 8 (¶¶ 12, 42).

[29] C. English Dep. – ECF No. 60-43 at 9-11 (pp. 93-95). This is the same Third Amended Complaint that was removed to start this federal action (*see* ECF No.1-14 at 2-20), and which remains the plaintiffs' operative complaint.

[30] C. English Decl. – ECF No. 65 at 8 (¶¶ 43-44).

[31] *See* ECF No. 60-30 at 3 (¶ 6); ECF No. 60-31 at 4-5 (¶ 18).

[32] ECF No. 60-30 at 3 (¶ 6).

[33] C. English Dep. – ECF No. 60-43 at 11 (p. 95).

**5. Rebates**

The plaintiffs also claim that the defendants shunted to SHRI certain vendor "rebates" to which the plaintiffs are entitled.[34] The plaintiffs have explained these rebates, and the defendants have not challenged the plaintiffs' factual description of this topic.

According to the plaintiffs, SHCC had "SHCC historically entered into agreements with vendors who provided approved or . . . products to" members' Straw Hat restaurants.[35] Under these agreements, the vendors "each paid SHCC a rebate based on the members' total monthly purchases from the vendor."[36] "In 2008, the last year during which all the operating Straw Hat restaurants were owned by SHCC members, SHCC received $139,076 in rebates from such suppliers. SHRI received no vendor rebate income in 2008."[37]

The SHCC Bylaws, as amended in 2008, provide that "[r]ebates normally received by the Corporation [*i.e.*, SHCC] shall continue to be received by the Corporation regardless of whether they are for Corporation restaurants or Franchise restaurants."[38] Nevertheless, beginning in 2009, Jonathan Fornaci (who was then the president of both SHCC and SHRI), caused the existing vendor agreements to be changed, and entered into agreements with additional vendors, which called for payment of the rebates to SHRI.[39] The Board of SHCC never approved the redirection of rebate payments to SHRI.[40]

This immediately affected the respective income of SHCC and SHRI. Again, according to the plaintiffs' unchallenged factual description: "In 2009, SHRI received $359,060 in rebate income, and SHCC received $0."[41] "In 2009, there were two SHRI franchise restaurants and approximately

---

[34] 3AC – ECF No. 1-14 at 1-15 (¶¶ 74-85).

[35] ECF No. 55 at 10 (citing ECF No. 57-5 at 34-45 [pp. 6-17]).

[36] *Id.*

[37] ECF No. 55 at 10 (citing ECF No. 57-5 at 34-45 [pp. 6-17]; ECF No. 58-2 at 22).

[38] Bylaws – ECF No. 58-1 at 14 (Art. VII, § 5).

[39] Strege Dep. – ECF No. 57-5 at 37-38 (pp. 9-10).

[40] *See, e.g.,* Listek Dep. – ECF No. 57-5 at 59-62 (pp. 110-13).

[41] ECF No. 55 at 10 (citing ECF No. 58-2 at 20, 22).

United States District Court
Northern District of California

50 SHCC members' restaurants operating."[42] "At least 90% of the 2009 rebate income was attributable to purchases by SHCC members."[43]

Similarly, "[i]n 2010 SHRI received $391,025 in rebate income, and SHCC received none . . . ."[44] Yet, "[i]n 2010, there were seven or fewer SHRI franchise restaurants and forty-one or more SHCC member restaurants operating."[45] "At least 80% of the 2010 rebate income was attributable to purchases by SHCC members."[46]

The defendants do not deny any of this. They instead frame the "renegotiation" of the rebate agreements as a proper part of moving the chain to SHRI franchises.[47] They concede that Mr. Fornaci directed these changes.[48] They also concede that "the [SHCC] Board minutes do not reflect explicit discussions concerning the renegotiation of the vendor . . . rebate agreements."[49] But they suggest that the SHCC board "was aware of which company" was receiving the rebates.[50] And that this occurred "against the backdrop" of the known plan to "transfer[]" the "employees, business, and operations of SHCC . . . to SHRI."[51]

### 6. The summary-judgment motions

Fourteen claims or counterclaims are before the court for summary judgment. The plaintiffs move for affirmative summary judgment on the following claims in their Third Amended Complaint (ECF No. 1-14):

- *Claim No. 4* – Conversion. Against SHRI for vendor rebates.

---

[42] ECF No. 55 at 10 (citing ECF No. 57-2 at 47 [Response #8], 56-59).

[43] ECF No. 55 at 10 (citing ECF No. 57-2 at 50 [Response #18]).

[44] ECF No. 55 at 11 (citing ECF No. 57-3 at 45; ECF No. 57-4 at 28-29 [pp. 104-05]).

[45] ECF No. 55 at 11 (citing ECF No. 57-2 at 47-48 [Responses #9 and 10], 61-64).

[46] ECF No. 55 at 11 (citing ECF No. 57-2 at 50 [Response #19]).

[47] *See* ECF No. 63 at 9.

[48] *Id*.

[49] *Id*.

[50] *Id.* (citing Listek Dep. – ECF No. 63-45 at 4-7 [pp. 110-13]).

[51] ECF No. 63 at 9.

United States District Court
Northern District of California

- *Claim No. 5* – Money had and received. Against SHRI for vendor rebates.
- *Claim No. 6* – Declaratory relief against all defendants to determine the composition of SHCC's board of directors.
- *Claim No. 7* – Trademark infringement. Against all defendants; concerning SHIPH's ownership interest in the Straw Hat marks.

The plaintiffs also move for summary judgment against the defendants' Counterclaim No. 17, which (like their own Claim No. 6) seeks a declaration on the composition of SHCC's board of directors.

The defendants move for affirmative summary judgment on the following counterclaims in their Third Amended and Supplemental Counter-Complaint (ECF No. 15):

- *Counterclaim No. 1* – Breach of fiduciary duty. Against Cole English.
- *Counterclaim No. 6* – Trademark infringement. (Lanham Act.)
- *Counterclaim No. 8* – False designation of origin. (Lanham Act.)
- *Counterclaim No. 10* – Trademark dilution. (Lanham Act.)
- *Counterclaim No. 18* – Declaration that June 2011 dissolution was legitimate
- *Counterclaim No. 19* – Declaration on the ownership of the Straw Hat intellectual property
- *Counterclaim No. 23* – Conversion of assets through SHIPH.

The defendants also seek summary judgment against the following three of the plaintiffs' claims:

- *Claim No. 2* – Inspection of SHCC's corporate records.
- *Claim No. 3* – Inspection of SHRI's corporate records.
- *Claim No. 7* – Trademark infringement. (Lanham Act.)

United States District Court
Northern District of California

1

### SUMMARY-JUDGMENT STANDARD

The court must grant a motion for summary judgment if the movant shows that there is no genuine dispute as to any material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986). Material facts are those that may affect the outcome of the case. *Anderson*, 477 U.S. at 248. A dispute about a material fact is genuine if there is sufficient evidence for a reasonable jury to return a verdict for the non-moving party. *Id.* at 248-49.

The party moving for summary judgment bears the initial burden of informing the court of the basis for the motion, and identifying portions of the pleadings, depositions, answers to interrogatories, admissions, or affidavits which demonstrate the absence of a triable issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). To meet its burden, "the moving party must either produce evidence negating an essential element of the nonmoving party's claim or defense or show that the nonmoving party does not have enough evidence of an essential element to carry its ultimate burden of persuasion at trial." *Nissan Fire & Marine Ins. Co., Ltd. v. Fritz Companies, Inc.*, 210 F.3d 1099, 1102 (9th Cir. 2000); *see Devereaux v. Abbey*, 263 F.3d 1070, 1076 (9th Cir. 2001) ("When the nonmoving party has the burden of proof at trial, the moving party need only point out 'that there is an absence of evidence to support the nonmoving party's case.'") (quoting *Celotex*, 477 U.S. at 325).

If the moving party meets its initial burden, the burden shifts to the non-moving party to produce evidence supporting its claims or defenses. *Nissan Fire & Marine Ins. Co., Ltd.*, 210 F.3d at 1103. The non-moving party may not rest upon mere allegations or denials of the adverse party's evidence, but instead must produce admissible evidence that shows there is a genuine issue of material fact for trial. *See Devereaux*, 263 F.3d at 1076. If the non-moving party does not produce evidence to show a genuine issue of material fact, the moving party is entitled to summary judgment. *See Celotex*, 477 U.S. at 323.

In ruling on a motion for summary judgment, inferences drawn from the underlying facts are viewed in the light most favorable to the non-moving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

United States District Court
Northern District of California

1

United States District Court
Northern District of California

## ANALYSIS

### 1.  Main issue: Could the plaintiffs take over a rump SHCC?

The core issue in this case is whether the plaintiffs could effectively do what they did: in short, to conclude that, after the June 2011 dissolution vote, they were the "only remaining members" of SHCC under the cooperative's bylaws, reconstitute a new SHCC board, revoke the dissolution, and transfer the Straw Hat intellectual property to SPIPH. That question is the heart of the parties' dispute. Resolving it will resolve many of the related issues that the parties have put before the court.

The plaintiffs' basic argument is simple. They point to Article VII, section 3 of SHCC's bylaws, which provides:

> **Sale or Conversion of Existing Restaurants.** A Member may sell, transfer or convert a restaurant to a Franchise. If the Member chooses to convert the store into a Franchise, then such action will cause that Member to lose that share of the Corporation associated with that restaurant.

(2008 Bylaws – ECF No. 60-11 at 14.) When other members of (the former) SHCC converted to SHRI franchises after voting to dissolve the cooperative, the plaintiffs argue, under this bylaw they lost their memberships in SHCC. By October 2012, only the six plaintiffs — who had voted against dissolution — had not sacrificed their SHCC memberships under this bylaw. The plaintiffs conclude that, as the "only remaining members" of SHCC, they acted properly when in 2012 they voted in a new board, voted to revoke the June 2011 dissolution, and transferred Straw Hat's intellectual property to SPIPH.[52]

This argument is too superficial. Its focus on one bylaw is narrow to the point of being blinkered. A more thorough analysis shows that the plaintiffs' argument is too cramped as contract interpretation, is at odds with California corporations statutes, and upends basic notions of corporate democracy.

---

[52] *See, e.g.,* ECF No. 55 at 13, 17.

United States District Court
Northern District of California

### 1.1 Contract analysis

First the contract analysis. California courts "construe articles of incorporation and corporate bylaws . . . 'according to the general rules governing the construction of statutes and contracts.'" *Oriental Mission Church v. Park*, 2015 WL 4396258, *9 (Cal. App. July 17, 2015) (quoting *Singh v. Singh*, 114 Cal. App. 4th 1293, 1294 (2004)). Those rules do not instruct the court to read bylaws through the wrong end of a telescope. To the contrary. "The fundamental canon of interpreting written instruments is

> the ascertainment of the intent of the parties. As a rule, the language of an instrument must govern its interpretation if the language is clear and explicit. A court must view the language in light of the instrument as a whole ***and not use a disjointed, single-paragraph, strict[-]construction approach*** . . . .
>
> When an instrument is susceptible to two interpretations, the court should give the construction that will make the instrument ***lawful***, operative, definite, ***reasonable*** and capable of being carried into effect and avoid an interpretation which will make the instrument ***extraordinary, harsh, unjust, inequitable or which would result in absurdity***.

*Ticor Title Ins. Co. v. Rancho Santa Fe Ass'n*, 177 Cal. App. 3d 726, 730 (1986) (quoted in *Oriental Mission Church v. Park*, 2015 WL 4396258, *9 (Cal. App. July 17, 2015)) (quotation and citations omitted) (emphases added). "Interpretation of a contract must be fair and reasonable, not leading to absurd conclusions." *Eucasia Schools Worldwide, Inc. v. DW August Co.*, 218 Cal. App. 4th 176, 182 (2013) (quotation omitted); *accord* Cal. Civ. Code § 1638. Finally, "[a] contract may be explained by reference to the circumstances under which it was made, and the matter to which it relates." Cal. Civ. Code § 1647.

This one bylaw thus cannot be read in hyper-isolation, plucked from the context in which it was adopted. That context is undisputed. The parties agree that for some time SHCC had contemplated a shift to franchising. Thus, as the plaintiffs explain, SHRI was formed in 2006 "as a vehicle for expanding the Straw Hat brand outside the coop model, through franchising." (ECF No. 55 at 9.) Then, in 2008, SHCC amended its bylaws; the bylaw that the plaintiffs invoke anticipated the move toward a franchise model. Finally, in June 2011, the majority of SHCC voted to dissolve the cooperative and offer SHCC members two options: either cash out or convert to an

SHRI franchise. The June 2011 vote did not offer members the option of continuing on as members of a persisting SHCC cooperative.

Within that context, the plaintiffs' application of this bylaw would lead to "extraordinary, harsh, unjust, inequitable," and even "absurd" results — a point that will become clear as the plaintiff's position is further assessed under California corporations statutes and in light of basic principles of corporate democracy.[53]

### 1.2 California's Cooperative Corporation Law[54]

The plaintiffs' argument also cuts against several provisions in California's Cooperative Corporation Law. The plaintiffs' position is out of synch both with the express terms of these statutes and, maybe more, with their depiction and implicit understanding of voluntary cooperative dissolutions. This is true in several ways. These statutes repeatedly recognize that dissolution is a "process." They contemplate a gap between the election to dissolve and final dissolution. (Given all that must be done, in practical, real-world terms, to unwind a business entity of any complexity, how could dissolution be other than a process extended in time?) Furthermore, these statutes state that a company's board of directors retains "full power[]" to run the company through dissolution. Finally, the statutes expressly say that a company that has chosen to dissolve continues to exist, and may function, only to carry out the dissolution. It does not remain extant as an object that may

---

[53] Perhaps it is academic, but it may cast further light on this case to observe that some of the friction driving this lawsuit seems to grow from a disjunction in how the 2008 bylaws, on the one hand, and the June 2011 dissolution vote, on the other, anticipate how the move to franchising would unfold. The 2008 bylaws seem to expect a gradual, dual-track process: some SHCC members would convert to franchises, giving up their memberships in the cooperative (which is understandable), while others remained as active SHCC coop members. (*See* ECF No. 60-9 at 2-3 [¶¶ 4, 11, 13]; ECF No. 60-11 at 14-15 [§§ 3, 6].) The June 2011 vote suggests a different, more "all or nothing" approach. Then, as we have seen, the majority of SHCC members voted to simply dissolve the cooperative and to allow members to either exit the business (taking a distribution) or convert to a franchise. The slippage between those two approaches — the ill fit between the different mechanisms that they set out — is what has allowed the plaintiffs to claim that the 2008 bylaw effectively upends what was undisputedly a valid election in June 2011 to dissolve the cooperative.

[54] The Cooperative Corporation Law is that part of the California Corporations Code that deals with this type of business entity; it occupies Cal. Corps. Code §§ 12200-12704. Voluntary dissolutions are governed by §§ 12630-63. All statutory citations within this section of the Analysis are to the Cooperative Corporation Law, unless otherwise specifically noted.

be seized, reformed, and carried off by a faction of dissenting owners. The Cooperative Corporation Law thus puts paid to the idea that the plaintiffs could invoke a bylaw to derail the majority's decision to dissolve SHCC. That the dissolution did not happen all at one stroke, or quickly enough for the plaintiffs' liking, did not empower them to jump into the gap and hijack the company.

We start at the beginning. SHCC undeniably had the right to dissolve itself. Section 12630(a) provides: "Any corporation may elect voluntarily to wind up and dissolve (1) by approval of a majority of all members (Section 12223) or (2) by approval of the board and approval of the members (Section 12224)." There is no dispute that the June 2011 dissolution vote was properly conducted and procedurally valid. That vote therefore sufficiently triggered the process of dissolution. Section 12633(a) states: "Voluntary proceedings for winding up the [cooperative] corporation *commence upon the adoption of the resolution* required by Section 12630 by the members or by the board, *electing to wind up and dissolve.*" (Emphases added).[55]

The next two code sections are pivotal for this analysis. The first provides: "When a voluntary proceeding for winding up has commenced, *the board shall continue to act as a board and shall have full powers to wind up and settle its affairs*, both *before* and after the filing of the certificate of dissolution." § 12633(b) (emphases added). The SHCC board thus retained power to carry through the dissolution process. The statute's plain implication ("shall continue to act") is that the board that retained "full powers to wind up" SHCC is the board *as constituted at the June 2011 vote.*

The second critical statute provides:

> When a voluntary proceeding for winding up has commenced, the corporation **shall cease to conduct its activities except to the extent necessary for the beneficial winding up** thereof, to the extent necessary to carry out its purposes, and except during such period as the board may deem necessary to preserve the

---

[55] Contrary to the plaintiffs' suggestion (*see* ECF No. 72 at 11), the defendants have both submitted evidence and cited legal authority (*see* ECF No. 60 at 7-18) showing that the dissolution vote was properly conducted. The plaintiffs never really challenge the validity of that vote; instead, they argue (in sum) that the vote could essentially be disregarded because "[d]efendants took no actions in furtherance of dissolution." (*See, e.g.,* ECF No. 72 at 11.) That is a different argument. And one that fails for reasons given elsewhere in this analysis.

United States District Court
Northern District of California

United States District Court
Northern District of California

1    corporation's goodwill or going-concern value pending a sale or other disposition
     of its assets, or both, in whole or in part.

2    § 12633(c) (emphasis added); *see also* § 12661(a) (same provision for fully "dissolved"

3    cooperatives). This defeats a key unstated premise in the plaintiffs' position. Given § 12633(c), the

4    election to dissolve SHCC subtly changed the corporation's powers and even its basic character.

5    The company now existed, and could act, only to the degree that was consistent with winding up.

6    Once (the old) SHCC voted to dissolve, then, the company could act "to the extent necessary" for

7    winding up; it did not exist as a target to be seized, reformed, and carted away by a disgruntled

8    minority. There is in other words something like an existential premise beneath the plaintiffs'

9    position — an assumption that, despite the June 2011 dissolution vote, SHCC remained essentially

10   unchanged; that it continued to exist as an entity that, if not unwound quickly enough, could be

11   manipulated through its bylaws, picked up intact, and carried off. The Cooperative Corporation

12   Law undoes that premise.

13                                      *   *   *

14       These statutes establish several things that bar the court from accepting the plaintiffs'

15   argument. They show that dissolution is a process, that it is expected to extend in time, rather than

16   happen in a flash after a company votes to dissolve, and is not something that can be ignored once

17   someone decides that it is not progressing quickly enough. *See also* § 12660(d) (contemplating

18   that "winding up" is a "process" in which acts may be taken "in contemplation of termination or

19   abandonment of the corporate business"). They show that a cooperative *with its board* continues

20   on even after the vote to dissolve, though only to the extent necessary for winding up. This implies

21   that the *June 2011* board retained "full power[]" to run SHCC after the dissolution vote. All of

22   which indicates that dissenting owners could not jump into the gap, merely because SHCC was

23   not yet fully dissolved, to overturn the dissolution vote, form a new board, and transfer away

24   corporate assets.[56]

25   ───────────────────────

26   [56] It is of course conceivable that a given dissolution could take so egregiously long that, at some point,
     the delay itself would give actors with sufficient standing ground to challenge the dissolution. But the
27   arguments and evidence before the court do not allow the conclusion that this is such a case. First, the
     plaintiffs have not elaborated a legal analysis showing when delay might undermine a valid
28   dissolution; nor have they shown that, in this specific case, the "delay" between the June 2011 vote
     and, say, the putative election of a new SHCC board in May 2012, constitutes a delay that legally

United States District Court
Northern District of California

### 1.3 Corporate democracy

Cooperative corporations "are democratically controlled." § 12201; *see also, e.g.,* §§ 12216, 12351(a)(7), 12480-85 (majority-rule and voting principles). The result that the plaintiffs seek would thwart corporate democracy. This is readily seen if one reviews the main points of the events in question. A majority of SHCC voted to dissolve the cooperative. They also voted to allow SHCC members two options: exit the dissolving company or convert to an SHRI franchise. A dissenting minority — in fact, 6 of the 19 members who had voted against dissolution, so a minority of the minority — then found a possible "Gotcha!" in the corporate bylaws, purported to elect a new board of directors, and carried off the coop's intellectual property for themselves. Six members (who lost the vote) thus walked away with property that all had built up. That is a patent breach of the most elementary tenets of corporate democracy. If there is a cogent legal argument that sanctions such an outcome, the court has not seen it. The "last valid decision" that SHCC members made "was to dissolve the [cooperative] corporation and wind up its affairs." *See Cent. Coast Baptist Ass'n v. First Baptist Church of Las Lomas*, 171 Cal. App. 4th 822, 854 (2007). The acts that the plaintiffs later took as the purported continuation of SHCC offend basic notions of corporate democracy.

### 1.4 Additional points

#### 1.4.1 The June 2011 vote gave members two choices: exit or franchise

Several other points should be made. The first is to emphasize that the June 2011 vote gave SHCC members only two options: either exit the company (taking a final distribution) or convert to an SHRI franchise. Members could not choose (as the plaintiffs did) to continue on as a cooperative. That was not an option. (*See* ECF No. 60-13 at 2-3.) This point is itself decisive. The

---

entitled the plaintiffs to take the actions that they did. Nor is there factual evidence supporting the idea that the dissolution process was excessively drawn out. On the topic of delay, it must be recalled that SHCC's post-June 2011 activity was partly affected by the plaintiffs' filing a lawsuit in October 2011. While they certainly had the right to challenge the dissolution by way of a lawsuit, it would be unacceptable (in more than one way) if the plaintiffs could impugn the dissolution process on the basis of a delay to which they contributed.

1    plaintiffs' argument assumes that they remained as a viable rump SHCC that could continue to

2    operate in the shoes of the imminently dissolving cooperative. But this is flatly at odds with the

3    June 2011 majority vote. That vote left the plaintiffs no such alternative. This undisputed fact

4    unravels one of the key unstated premises of the plaintiffs' argument.

5

6        **1.4.2    Not filing a § 12631 certificate did not negate the June 2011 dissolution**

7        Once a cooperative corporation elects to dissolve itself, section 12631 requires it to file a

8    "certificate evidencing that election" with the California Secretary of State. The plaintiffs point to

9    the undisputed fact that (the former) SHCC never filed this certificate. (*E.g.,* ECF No. 55 at 12.)[57]

10       This does not impugn the validity or effectiveness of the dissolution that the majority voted

11   upon in June 2011; nor did it empower the plaintiffs to persist as a rump SHCC that elected a new

12   board and transferred Straw Hat's intellectual property to SPIPH. The defendants are entirely

13   correct when they write:

> That SHCC's Board of Directors did not file a certificate to wind up and dissolve
> SHCC, nor transferred its assets to SHRI[,] does not mean that they forfeited the
> right to do so, or the right to control SHCC's assets. The provisions for filing such a
> certificate "were enacted for the convenience of the Secretary of State and the
> public, and for the protection of the directors and trustees, but ***strict compliance
> therewith is not necessary***. ***Particularly is this true in the absence of any showing
> of injury*** by a failure to so comply." *Herschfelt v. Knowles-Raymond Granite Co.*,
> 130 Cal. App. 2d 347, 351 (1955) (discussing Cal. Corp. Code § 1901(a),which is
> [basically] identical to Section 12361(a)); *Bank of Alameda County v. McColgan*,
> 69 Cal. App. 2d 464, 473-74 (1938). Plaintiffs have not shown that any party was
> injured by noncompliance.

20   (ECF No. 82 at 8) (emphasis added).

21       Were the plaintiffs correct in this failure-to-file argument, moreover, it would undermine their

22   own case. They write: "In May 2012 Plaintiffs, the sole remaining members of SHCC[,] voted

23   unanimously to revoke the June 2011 dissolution vote." (ECF No. 72 at 11) (citing declarations).

24   Section 12632 requires cooperatives in such a situation to file a "signed, verified" certificate

25   "evidencing the revocation." § 12632(a). There is no evidence in the record that the plaintiffs filed

26

27   _____

     [57] The plaintiffs cite Cal. Corps. Code § 1901 on this point (ECF No. 55 at 12), but that is part of the
28   General Corporation Law; the more accurate source for the obligation, as it applies to cooperative
     corporations, is Cal. Corps. Code § 12631.

that certificate.[58] Were their premises correct about the effect of these required certificates, then, it would equally nullify their revocation vote.

### 1.4.3   The rump SHCC could not revoke the June 2011 dissolution vote

The next point is a broader one about the new SHCC's revocation vote. The plaintiffs write: "A vote by the members to dissolve can be revoked by approval of a majority of the members before the distribution of assets." (ECF No. 72 at 11) (citing § 12632). By this, the plaintiffs mean to show that their May 2012 vote to reverse the majority's June 2011 dissolution vote was valid and effective. The analysis to this point already shows why this argument must fail as a matter of law.

The core problem is that this argument begs the deeper question. Or, we could equally say, the plaintiffs' key assumption here is wrong: The rump SHCC could not persist in the shoes of the former SHCC, having shorn its adverse majority, but otherwise carrying forward all its powers and property. For the reasons already given, the plaintiffs could not rightly march on as SHCC, reforming a board, revoking past votes of the former SHCC, and so on. The majority vote in June 2011 did not give members the option of continuing as the SHCC cooperative; California statutes dictate that "full powers" remained in the June 2011 board to carry through the process of dissolution; after the June 2011 vote, SHCC could act only to the extent consistent with winding up — it did not remain essentially unchanged to be picked up and carried off by a minority who lost the vote; and signing on to the plaintiffs' contrary analysis would be to sanction a deep breach of corporate democracy. *Cf. Central Coast Baptist*, 171 Cal. App. 4th at 853-54 ("handpicked" members in unnoticed meeting could not rescind earlier, valid, majority vote to dissolve corporation).

---

[58]   *See* C. English Decl. – ECF No. 65 at 6 (¶ 33); O. Sehhat Decl. – ECF No. 68 at 3 (¶ 13); R. Matthews Decl. – ECF No. 69 at 3 (¶ 12); G. Mehrok Decl. – ECF No. 70 at 3 (¶ 12).

United States District Court
Northern District of California

United States District Court
Northern District of California

### 1.5 Summation: Core holding and follow-on effects

Thus the court must reject as a matter of law the plaintiffs' reading of the SHCC bylaw and the sweeping consequences that they built upon that reading. The plaintiffs' ultra-narrow application of that one bylaw is "unlawful" by being out of synch with California corporations law and basic principles of corporate democracy. The result that the plaintiffs reach — effectively overturning a majority vote and then carrying off the cooperative's intellectual property — is "extraordinary, harsh, unjust, [and] inequitable." *See Ticor Title*, 177 Cal. App. 3d at 730. It is partly in seeing how the plaintiffs' position would abrade California corporation law, and rudimentary notions of corporate democracy, that the plaintiffs' position appears unacceptable even as contract analysis — however simple and superficially cogent it first appeared. In these circumstances, "[i]t would be absurd if the law required . . . strict adherence to the letter of" this single bylaw. *See Eucasia Schools Worldwide,* 218 Cal. App. 4th at 182 ("Interpretation of a contract must be fair and reasonable, not leading to absurd conclusions.") (quotation omitted) (citing cases); *see also* Cal. Civ. Code § 1638 ("The language of a contract is to govern its interpretation, if the language is clear and explicit, and does not involve an absurdity.").

Furthermore, as we have seen, the plaintiffs' argument suffers from a deeper flaw. One that logically precedes the question of bylaw interpretation. An unstated premise of their position is that, after the June 2011 dissolution vote, they could carry on as SHCC, invoke this bylaw, then proceed to elect a new board, revoke the dissolution, and so on. That premise is incorrect. The June 2011 ballot and vote gave SHCC members only two choices: exit the dissolving cooperative and take a terminal distribution or convert to an SHRI franchise. The plaintiffs have not pointed the court to any law (and the court has not found any) that would permit them, as a dissenting minority, to upend the majority decision once they decided that the dissolution process was not moving quickly enough. This unravels the plaintiffs' position before the question of interpreting the bylaw is reached.

The court thus concludes that everything that the plaintiffs did after the June 2011 dissolution vote, as a putatively persisting and reconstituted SHCC cooperative, was null. The plaintiffs had no power to do what they did. The court correspondingly holds that the proper and duly authorized

board of SHCC is the board that existed as of the June 2011 vote; this board alone has the right and "full power[]" to carry forward the process of dissolving SHCC.

The court thus reaches the following specific holdings. The court denies the plaintiffs' motion for summary judgment on their Claim No. 6 and on the defendants' Counterclaim No. 17 — both of which seek declarations on the proper constitution of the SHCC board of directors. Given the court's substantive holding on this point, the court grants the defendants summary judgment on their Counterclaim No. 17. *See* Fed. R. Civ. P. 56(f).[59] The court grants the defendants' motion for summary judgment on their Counterclaim No. 18 and declares that the dissolution vote of June 15, 2011 was procedurally valid under SHCC's bylaws and met the statutory requirements for an effective voluntary-dissolution election under § 12630.

The court grants the defendants' motion for summary judgment on their Counterclaim No. 19 and declares that the Straw Hat intellectual property belongs to SHCC, as it was constituted on June 15, 2011, and under the control of SHCC's then-existing board. The court denies plaintiff SHIPH's motion for summary judgment on its Claim No. 7 and grants the defendants' summary-judgment motion on that same claim: SHIPH has no legitimate ownership interest in Straw Hat's intellectual property; thus, as a matter of law, SHIPH has no viable claim for the infringement of Straw Hat's trademarks. *See ProtectMarriage.com v. Courage Campaign,* 680 F. Supp. 2d 1225, 1228 (E.D. Cal. 2010) ("The traditional elements of a claim for trademark infringement are *ownership* of a protectable mark and likelihood of confusion arising from defendant's use of the

---

[59] The defendants have not moved for summary judgment on their Counterclaim 17. (ECF No. 60 at 4; ECF No. 61 at 5.) This does not preclude granting them summary judgment on that claim. Federal Rule of Civil Procedure 56(f) provides: "After giving notice and a reasonable time to respond, the court may . . . grant summary judgment for a nonmovant . . . or . . .  consider summary judgment on its own after identifying for the parties material facts that may not be genuinely in dispute." Summary judgment for the defendants on Counterclaim 17 follows necessarily from the court's analysis of the *plaintiffs'* motion on this counterclaim and the topic that it comprehends (the composition of SHCC's board). Should the plaintiffs believe that this is wrong, that something more needs to be considered before the court can grant the defendants summary judgment on Counterclaim 17, then under Rule 56(f) the court invites them "to respond" on this point. In deciding whether to respond, the plaintiffs should realize that this is not an invitation to reargue the whole board-composition issue, but, rather differently, to show precisely how summary judgment for the defendants on Counterclaim 17 cannot follow despite the court's denying the plaintiffs' motion on Claim 6 and Counterclaim 17.

United States District Court
Northern District of California

1   mark.") (emphasis added); *Applied Info. Sciences Corp. v. Ebay, Inc.*, 511 F.3d 966, 969-70 and n.

2   2 (9th Cir. 2007) (infringement plaintiff must hold "valid, protectable" interest in mark;

3   registration is *prima facie* but not irrefutable proof of such interest).

4                                          *   *   *

5          More broadly, and more basically, as a consequence of its summary-judgment holdings the

6   court orders the plaintiffs to roll back everything that they did as a putative new SHCC. This will

7   include (among other things) executing and filing whatever documents are needed to return the

8   Straw Hat intellectual property to SHCC (as constituted under its June 2011 board). The court

9   directs the parties to confer on what precise steps must be taken to reconstitute the status quo that

10  existed at the time the plaintiffs filed their lawsuit — which is to say, after the June 2011

11  dissolution vote, and after all SHCC members but the six plaintiffs had converted their businesses

12  to SHRI franchises. Determining what practical steps must be taken to put things back the way

13  they were should be a mostly uncontroversial affair. The parties may inform the court of the steps

14  that must be taken by way of a joint case-management statement. (If further briefing is needed, the

15  parties may inform the court of that, and the court will set out an appropriate briefing schedule.)

16  Once the needed steps are determined, the court will enter a supplemental order directing that

17  those steps be carried out.

18

19  **2. Conversion**

20         The court grants the defendants partial summary judgment on their conversion claim. The

21  court denies summary judgment on the damages element of that claim.[60] The defendants contend

22  that the plaintiffs converted "the other members' interests in SHCC's assets by purporting to

23  transfer the [Straw Hat] intellectual property to SHIPH . . . without actually owning" that property.

24  (ECF No. 60 at 21.) The facts concerning the purported transfer are undisputed. Only the legal

25  effect of those facts is in question.

26

27  [60] *See* Fed. R. Civ. P. 56(a) ("A party may move for summary judgment, identifying each claim or
    defense — *or the part of each claim or defense* — on which summary judgment is sought.") (emphasis
28  added).

1    The basics of conversion are familiar. "[A]ny act of dominion wrongfully exerted over the

2    personal property of another inconsistent with the owner's rights thereto constitutes conversion."

3    *Mindys Cosmetics, Inc. v. Dakar*, 611 F.3d 590, 601 (9th Cir. 2010) (quoting *McCafferty v.*

4    *Gilbank,* 249 Cal. App. 2d 569, 576 (1967)). To prove conversion, a plaintiff "must establish: (1)

5    his ownership of or right to possess the property in question at the time of the conversion, (2) that

6    the defendant disposed of the plaintiff's property rights or converted the property by a wrongful

7    act, and (3) damages." *Swingless Golf Club Corp. v. Taylor*, 732 F. Supp. 2d 899, 910 (N.D. Cal.

8    2010) (*citing Oakdale Village Grp. v. Fong*, 43 Cal. App. 4th 539, 544 (1996)).

9

10    **2.1 Trademarks are proper subjects of conversion in California law**

11    The court must first address whether trademarks can be the objects of conversion in California

12    law. This court concludes that they can. *See Kremen v. Cohen,* 337 F.3d 1024 (9th Cir. 2003);

13    *Fremont Indem. Co. v. Fremont Gen. Corp.,* 148 Cal. App. 4th 97 (2007). The debate is not

14    entirely closed, however, so the point warrants discussion. And, while the following discussion

15    threads mainly around trademarks, the analysis reaches other forms of the Straw Hat intellectual

16    property, which the court specifies below.

17    The Ninth Circuit discussed the conversion of intangible assets under California law in

18    *Kremen, supra*. The court there held that an Internet domain name could be converted. *Id.* at 1029-

19    36. The Ninth Circuit's reasoning in *Kremen* suggests a broad view of the intangible property that

20    may be the proper object of a conversion claim in California law. "Property is a broad concept,"

21    *Kremen* explained, "that includes 'every intangible benefit and prerogative susceptible of

22    possession or disposition.'" *Kremen*, 337 F.3d at 1030 (quoting *Downing v. Mun. Court,* 88 Cal.

23    App. 2d 345, 350 (1948)). To determine whether an actionable property right exists, the Ninth

24    Circuit applies a three-part test: "First, there must be an interest capable of precise definition;

25    second, it must be capable of exclusive possession or control; and third, the putative owner must

26    have established a legitimate claim to exclusivity." *Kremen*, 337 F.3d at 1030. Under this test,

27    *Kremen* recognizes that conversion can extend to several forms of intellectual property.

28

United States District Court
Northern District of California

1    Trademarks, service marks, trade names, and much of the other intellectual property at issue

2 here, meet this test. These can be precisely defined, exclusively possessed and controlled, and they

3 can be the subject of a legitimate claim to such exclusivity. Under *Kremen*, then, such intellectual

4 property should normally be proper objects of conversion.

5    Two cases from this district, however, have reached different decisions. In *Meeker v. Meeker*,

6 No. C 02-00741-JSW, 2004 WL 2554452 (N.D. Cal. Nov. 10, 2004), facing a claim that the

7 defendant had "fraudulently register[ed]" the plaintiff's trademark with the U.S. Patent and

8 Trademark Office, Judge White held that the alleged conversion of a trademark did not state a

9 cognizable theory in California law. *Id.* at *4-6. More specifically, Judge White reasoned that

10 conversion does not apply to trademarks because "the nature of the property right attendant to a

11 trademark" is "to avoid confusion." *Id.* at *5-6. Distinguishing trademarks from the Internet

12 domain name that *Kremen* had held actionable, Judge White wrote:

13       In *Kremen*, the Ninth Circuit likened "[r]egistering a domain name [to] staking a
         claim to a plot of land at the title office. ***It informs others that the domain name is***
14       ***the registrant's and no one else's.*** " ***In contrast, the essence of the property right***
         ***granted to a trademark owner is "to prevent customer confusion*** as to who
15       produced the goods and to facilitate differentiation of the trademark owner's
         goods." *International Order of Job's Daughters v. Lindeburg and Company*, 633
16       F.2d 912, 919 (9th Cir. 1981). *Cf.* 1 *McCarthy on Trademarks and Unfair*
         *Competition* § 2.14 at 2–31 ("Once created, the 'property' right of a trademark is
17       invaded by a junior user's use of a similar mark that is likely to create confusion.
         Hence, the 'property' in a trademark is the right to prevent confusion." ) (emphasis
18       added).

19       In this Court's view, the nature of the property right attendant to a trademark is
         sufficiently different from the property right attendant to a domain name. Thus, the
20       Court concludes that a claim for conversion should not be extended to reach the
         intangible intellectual property rights in a trademark.

21 *Meeker*, 2004 WL 2554452, at *5-6 (citation omitted) (first emphasis added).

22    This court reaches a different conclusion. Even if the point of trademarks is "to prevent

23 confusion," it is also true that registering the trademark — like registering an Internet domain

24 name or a plot of land — "informs others that the [trademark] is the registrant's and no one

25 else's." Even if trademarks exist to "prevent confusion," then, that does not effectively distinguish

26 them from other forms of property that can be converted. Preventing confusion does not preclude

27 meeting *Kremen's* "property right" test. All parts of that test are indeed met here. The Straw Hat

28 marks are precisely defined, can be exclusively possessed and controlled, and are the subject of a

United States District Court
Northern District of California

1   legitimate claim to such exclusivity. This court thus finds the trademarks here to be sufficiently

2   similar to the intangible property that *Kremen* held actionable that the present plaintiffs'

3   conversion claim is legally viable. The marks in question were not the plaintiffs'; they were

4   "someone else's"; and to officially register a contrary claim was (in this court's view) to assert

5   "dominion" over those marks "in a manner that is inconsistent with" the true owner's right —

6   which is to say, was conversion.  *See Fremont Indemnity*, 148 Cal. App. 4th at 119 (2007)

7   ("dominion," "inconsistent"); *Mindys Cosmetics,* 611 F.3d at 601 (same).

8       The second relevant decision from this district is *Tethys Bioscience, Inc. v. Mintz, Levin, Cohn,*

9   *Ferris, Glovsky & Popeo, P.C.*, No. C09-5115 CW, 2010 WL 2287474 (N.D. Cal. June 4, 2010).

10  The court there applied *Kremen* and cited *Meeker* in concluding that a patent application could not

11  be the object of conversion. *Id.* at *7. This court takes no view of that particular conclusion. The

12  following passage from *Tethys Bioscience*, however, suggests a possible limitation on *Kremen*:

13      [A]lthough *Kremen* recognized that intangible property could be converted,
        ***subsequent California cases addressing the application of the conversion tort to***
14      ***intangible property have suggested that this theory should not be expanded to***
        ***"displace other, more suitable law***." [*Fremont Indemnity*, 148 Cal. App. 4th at
15      124]; *see also Silvaco Data Sys. v. Intel Corp.*, 184 Cal. App. 4th 210 (2010). For
        this reason, the Court declines to extend the tort of conversion to encompass claims
16      concerning the copying of patent applications, which would implicate federal
        patent law. *Cf. Meeker v. Meeker*, 2004 WL 2554452, at *6 (N.D. Cal.) (declining
17      to extend conversion tort "to reach the intangible intellectual property rights in a
        trademark").

18  *Tethys Bioscience*, 2010 WL 2287474, at *7 (parallel citations omitted) (emphasis added).

19      This court does not think that this identifies a reason for denying trademarks the protection of

20  California conversion law. First, the kinds of intangibles that *Fremont Indemnity* discusses, those

21  that might remain outside conversion and left to "more suitable" remedies, were almost wholly

22  disembodied: "business goodwill," a "competitor's customer route," "unpaid commissions not

23  evidenced by a receipt or certificate," "an idea." *See Fremont Indemnity,* 148 Cal. App. 4th at 119.

24  The trademarks involved here — the Straw Hat logo and such — are more concrete than these,

25  and are further shored up by being federally registered. Certainly they are no less concrete than the

26  domain name in *Kremen*.

27

28

United States District Court
Northern District of California

United States District Court
Northern District of California

Second, the "suggestion" in *Fremont Indemnity* — that conversion of intangibles not be expanded to displace more suitable law — was only a fleeting reference to Dean Prosser's "caution[] against scuttling conversion's tangibility requirement altogether." *See id.* at 119-20. The fuller discussion in *Fremont Indemnity* gives a much broader view of the intangible property that can be the subject of conversion, generally cuts *against* Dean Prosser's suggestion, and (in this court's view) *supports* the idea that trademarks embody a sufficiently definite and exclusive property right to ground a claim in conversion. *See id.* at 119-26.[61]

In sum, the court holds that, under *Kremen* and *Fremont Indemnity*, the following Straw Hat intellectual property can be the object of conversion under California law, and so are covered by this order: "all trademarks, service marks and trade names"; all Internet domain names used in Straw Hat's business (*see Kremen, supra*); and all "recipes, copyrights, and non-registered trademarks." (*See, e.g.,* ECF No. 60-44 at 62.)

## 2.2 Case-specific conversion analysis

The court thus turns to the present defendants' conversion claim. The dispositive issue in that claim is whether the plaintiffs rightfully gained sole ownership of Straw Hat's intellectual property when they concluded that they were the only remaining members of SHCC, elected a new board of directors, and so on. The court has already concluded that the plaintiffs had no power to do any of this. This effectively disposes of the conversion claim: the plaintiffs never rightfully owned the Straw Hat intellectual property — at least, they did not own it free of the ownership interests of other former SHCC members — so that by transferring it to SHIPH, which only the plaintiffs owned, and by registering ownership with the U.S. Patent and Trademark Office, the plaintiffs wrongfully converted SHCC's assets.

---

[61] The other case that *Tethys Bioscience* cites in this area — *Silvaco Data Sys. v. Intel Corp.,* 184 Cal. App. 4th 210 (2010) — only points to that part of *Fremont Indemnity* that the main text has just discussed. *See Silvaco Data Systems,* 184 Cal. App. 4th at 239 n. 21. *Silvaco Data Systems* also noted that the "traditional[]" common-law rule limiting conversion to tangible property "has been greatly eroded." *Id.*

That the plaintiffs may have genuinely believed themselves to be the only remaining SHCC members after October 2011, and the only owners of the Straw Hat assets, does not change this conclusion. The undisputed fact is that they took what legally was not theirs. That alone is conversion:

> Conversion is a strict liability tort. The foundation of the action rests neither in the knowledge nor the intent of the defendant. . . . [T]he act of conversion itself is tortious. Therefore, questions of the defendant's good faith, lack of knowledge, and motive are ordinarily immaterial.

*Burlesci v. Peterson*, 68 Cal. App. 4th 1062, 1066 (1998) (citing cases).

The court moreover discerns two operative heads to the alleged conversion. The first is the purported transfer of Straw Hat's intellectual-property rights from the reformed SHCC to SHIPH. The second is SHIPH's registering ownership of the assets with the federal patent office. The first of these, standing alone, could almost be treated as a nullity. The court has held that the new SHCC never gained legitimate ownership of Straw Hat's assets. Rightful ownership always remained with SHCC as it was constituted in June 2011, under the control of its then existing board. Considering only the "transfer" to SPIPH, it might be possible to hold that no conversion occurred because no transfer ever really occurred. The same cannot be said of the plaintiffs' registering their (putative) ownership with the federal patent office. That is an undeniable "act of dominion" over the Straw Hat intellectual property. *Cf. Mindys Cosemtics*, 611 F.3d at 600-01 (finding a "reasonable probability" of conversion — in denying anti-SLAPP motion — where defendant wrongly registered trademarks in non-owner's name).[62]

### 2.3 The defendants have not shown undisputed conversion damage

The court nevertheless declines to enter full summary judgment on the defendants' conversion claim. The defendants have not adequately shown that they suffered actual damage as a result of the conversion. They state that they have been damaged but do not specify in what that damage

---

[62] None of this is to deny that, as members of the dissolving SHCC, the plaintiffs had some right to share in Straw Hat's intellectual property. Presumably, if they choose to exist the dissolving cooperative rather than convert to franchises, their share in the intellectual property will be reflected in the value of the terminal distribution that they will take under the June 2011 dissolution vote.

1  consists. Nor do they identify proof of that damage. (*See* ECF No. 60 at 22; ECF No. 82 at 14.)

2  Their legal analysis on damages consists of a single, unelaborated cite to California Civil Code

3  § 3336. (*See* ECF No. 60 at 22.) Section 3336 provides:

4     The detriment caused by the wrongful conversion of personal property is
       presumed to be:

5     First – The value of the property at the time of the conversion, with the interest
       from that time, or, an amount sufficient to indemnify the party injured for the loss

6     which is the natural, reasonable and proximate result of the wrongful act
       complained of and which a proper degree of prudence on his part would not have

7     averted; and

8     Second – A fair compensation for the time and money properly expended in
       pursuit of the  property.

9  Cal. Civ. Code § 3336. This plainly contains some presumption of damage. But it is not clear

10  whether this presumption is meant to fully satisfy the substantive requirement of actual damage or

11  only to provide some measure of that damage, which must still be substantiated by appropriate

12  proof. Some comparatively recent California precedent points to the continued requirement of

13  actual proof: "Actions for the taking and damaging of private property are . . . in the field of

14  tortious action, and hence are subject to the rule that proof of damage is an essential part of the

15  plaintiff's case." *Lueter v. State of California*, 94 Cal. App. 4th 1285, 1302 (2002) (quotation

16  omitted). There is a genuine question over whether the conversion caused the defendants actual

17  damage. The court cannot assume that it did: actual damage is, again, a requisite of conversion;

18  and it is black-letter law that damages cannot be based on speculation. *E.g., id.* ("Whatever the

19  proper measure of damages may be, in a given case, the recovery therefor is still subject to the

20  fundamental rule that damages which are speculative . . . imaginary, . . . or merely possible cannot

21  serve as a legal basis for recovery.") (quoting *Frustuck v. City of Fairfax* 212 Cal.App.2d 345,

22  367-68 (1963)).

23     Without some elaboration of such matters by the parties, the court is unwilling to generate the

24  possible analysis itself, much less to grant the defendants summary judgment on this cursorily

25  treated requisite element. It is not this court's job — or its proper role as neutral arbiter — "to

26  scour the record in search of genuine factual issues regarding [the defendants'] . . . claim; rather, it

27  is the [defendants'] job to 'identity with reasonable particularity the evidence'" and the arguments

28

United States District Court
Northern District of California

that warrant summary judgment. *See Rodriguez v. City of Moses Lake*, 2008 WL 5205947, \*4
(E.D. Wash. Dec. 11, 2008) (quoting *Keenan v. Allen*, 91 F.3d 1275, 1279 (9th Cir. 1996)). The
court therefore denies the defendants' motion for summary judgment on this aspect of their
conversion claim.

### 3.  Lanham Act

The defendants bring three claims under the federal Lanham Act (15 U.S.C. §§ 1051-1127).
They seek summary judgment on all three. The defendants accuse the plaintiffs of trademark
infringement, false designation of origin, and trademark dilution. (3ACC – ECF No. 15 at 25-29
[¶¶ 98-103, 109-13, 117-22].) These claims are based primarily on the plaintiffs' distributing
SHCC's intellectual property to themselves, assigning it to SHIPH, and then registering that
assignment with the federal patent office. (*See id.*) In their summary-judgment briefs, in discussing
their Lanham Act claims, the defendants also challenge the plaintiffs' use of the Straw Hat
trademarks in their restaurants without ensuring that those restaurants are observing the chain's
"quality controls." (ECF No. 60 at 24, 26.) The latter grievance, however, is not obviously
encompassed in the defendants' operative counterclaim complaint.

The court denies summary judgment on these claims. The defendants' analysis does not permit
the court to say, as a matter of law, that they have fully proven any of their Lanham Act theories.
The defendants' argument raises more doctrinal questions than it answers. As both parties have
tended to do throughout their summary-judgment briefing, the defendants' Lanham Act analysis
sets out general propositions (for example, the basic elements of dilution) and then summarily
declares that some fact satisfies a given element or the whole of a given test. There is, in other
words, little to no mediating analysis in the defendants' argument. Nothing showing that, under
governing law — meaning statutes, controlling tests, and (to the extent possible) case law that
applies those rules to specific, maybe even analogous, situations — the undisputed facts in this
case indeed satisfy the given requisite elements, the given controlling tests.

The parties should also take care to parse the Lanham Act claims one from the next. The court
is aware that Lanham Act theories overlap. Nevertheless, it is the parties' responsibility to

United States District Court
Northern District of California

describe, delimit, and defend their claims with an acceptable degree of analytical rigor. It is the parties' responsibility to sufficiently organize their analysis to show that, given certain elements, tests, and rules, the undisputed facts indeed establish some or all of the requisites of a definite Lanham Act theory.

### 4.   Vendor rebates: Conversion and money had and received

The plaintiffs move for affirmative summary judgment on their claims for the rebates that they believe the defendants owe SHCC. Their claims on this issue sound in conversion and money had and received. Conversion, again, requires a plaintiff to show her "ownership of or right to possess the property in question," that the defendant converted the property "by a wrongful act," and damages. *E.g., Swingless Golf Club*, 732 F. Supp. 2d at 910. To prove a claim for money had and received, a plaintiff must show all of the following: 1) the defendant "received money that was intended to be used for the benefit of" the plaintiff; 2) the money "was not used for" the plaintiff's benefit; and 3) the defendant "has not given the money to" the plaintiff. CACI No. 370. "Although such an action is one at law, it is governed by principles of equity." *Mains v. City Title Ins. Co.*, 34 Cal. 2d 580, 586 (1949). The claim is viable "wherever one person has received money which belongs to another, and which in equity and good conscience should be paid over to the latter." *Avidor v. Sutter's Place, Inc.*, 212 Cal. App. 4th 1439, 1454 (2013).

The court assumes without deciding that in California law conversion can lie over these rebates, as an intangible debt allegedly owed to the plaintiffs. *See generally, e.g., Welco Elecs., Inc. v. Mora,* 223 Cal. App. 4th 202, 209-10 (2014) ("[C]ourts have permitted a recovery for conversion of assets reflected in such documents as accounts showing amounts owed . . . . In California, the tort of conversion has expanded well beyond its original boundaries.") (quotation omitted).

The court cannot hold as a matter of law that the plaintiffs have established either claim. The plaintiffs' motion for summary judgment on these claims is therefore denied.

The first problem with the plaintiffs' argument is that it rests on a mistaken premise. The plaintiffs assume that SHCC and SHRI were wholly distinct companies — and, more precisely,

they assume that they can proceed as a rump SHCC to make a claim against SHRI for the rebates. But the earlier discussion of the main issue shows that this is wrong: The plaintiffs had no power to act as a reformed SHCC; they have no power now to claim that these rebates were wrongfully withheld from SHCC.

The second problem is that the undisputed facts of this case make it impossible to say, as a matter of law, that renegotiating the rebate agreements was inequitable and in bad conscience (money had and received). As the defendants rightly point out, the rebates were channeled to SHRI in the context of the Straw Hat chain moving to a franchise model under SHRI.

Finally, the plaintiffs have not shown as a matter of law that they have been damaged by the rebates being paid to SHRI. Even if they are correct in arguing that, under the 2008 bylaws, the rebates should have been paid to SHCC, the undisputed facts of this case raise a genuine dispute over whether the plaintiffs were injured. Again, the June 2011 dissolution vote undeniably gave the plaintiffs the choice of exiting the dissolving cooperative or converting to an SHRI franchise. For all the court has seen, the plaintiffs seem to still have that choice. If they exit the company, then presumably some part of the rebates (as captured in the value of SHRI) will be reflected in the terminal distribution that they will take. If they convert to SHRI franchises, then of course the plaintiffs will enjoy the benefits of the rebates through the medium of SHRI.

**5.   Fiduciary breach**

The defendants seek summary judgment on their counterclaim that Cole English breached his fiduciary duty to SHRI when, while serving an SHRI director, he authorized the filing of the Third Amended Complaint against SHRI. The defendants argue that, "although the lawsuit pre-dated his membership on the [SHRI] Board, Cole English exposed SHRI to significant additional liability whe[n] he authorized the filing of the trademark[-]infringement claim [in the Third Amended Complaint] against all Defendants on behalf of SHIPH, of which he was a managing member." (ECF No. 60 at 16.)

To prove a breach of fiduciary duty, the defendants must show: "(1) [the] existence of a fiduciary duty; (2) breach of the fiduciary duty; and (3) damage proximately caused by the

breach." *ViChip Corp. v. Lee*, 438 F. Supp. 2d 1087, 1099 (N.D. Cal. 2006) (quoting *Stanley v. Richmond,* 35 Cal. App. 4th 1070, 1086 (1995)). There is no doubt that a director owes his company fiduciary duties:

> A director shall perform the duties of a director, including duties as a member of any committee of the board upon which the director may serve, in good faith, *in a manner such director believes to be in the best interests of the corporation* and its shareholders and with such care, including reasonable inquiry, as an ordinarily prudent person in a like position would use under similar circumstances.

Cal. Corps. Code § 309(a) (emphasis added). Of special relevance here is the "duty of loyalty," that part of a director's fiduciary duties that require him to put the company's "best interests" first. This duty is a foundation of corporate law and it is broad:

> A public policy, existing through the years, derived from a profound knowledge of human characteristics and motives, has established a rule that demands of a corporate officer or director, peremptorily and inexorably, the *most scrupulous observance* of his duty, not only affirmatively to protect the interests of the corporation committed to his charge, but also *to refrain from doing anything that would work injury to the corporation* . . . .

*Bancroft-Whitney Co. v. Glen*, 411 P.2d 921, 934-35 (Cal. 1966) (emphases added).

No fact is disputed in this area. Mr. English agrees that, in his role as a principal of English and Sons and SHIPH, he authorized the filing of a Third Amended Complaint (with its trademark-infringement claim) against SHRI at a time that he was serving as SHRI's director. Furthermore, while he was an SHRI director, Mr. English approved the transfer of a Straw Hat restaurant to a new owner; this transfer necessarily "required and permitted" the new owner to use the Straw Hat marks.[63] (The SHRI board's minutes also show that "English made the motion to approve" certain terms of that transfer.[64]) The defendants thus offer a fair gloss when they observe that English has sued SHRI for an alleged infringement that he at least partly approved. Finally, English testified that his authorizing an infringement claim against SHRI was "[p]robably not" to that company's benefit.[65]

---

[63] *See* ECF No. 60-30 at 3 (¶ 6); ECF No. 60-31 at 4-5 (¶ 18).

[64] ECF No. 60-30 at 3 (¶ 6).

[65] C. English Dep. – ECF No. 60-43 at 11 (p. 95).

On this record, the court grants the defendants partial summary judgment on their fiduciary-breach claim. The defendants have shown, as a matter of law, that English owed fiduciary duties of care and loyalty to SHRI. The defendants have not shown, beyond a genuine doubt, that English's acts breached those duties or proximately harmed SHRI. The lack here really is one of legal analysis. The parties have not gone far enough into the questions of breach and proximately caused damage to permit the court to take these issues from the jury. For their part, the plaintiffs argue as if the only thing that the duty of loyalty comprehends are transactions (sales and the like) in which a director has some competing interest. That is a cramped view. As the Supreme Court of California long ago made clear — and this comports with American jurisprudence generally — a director's duty of loyalty "demands" his "most scrupulous" efforts "to refrain from doing anything that would work injury to the corporation." *Bancroft-Whitney*, 411 P.2d at 934-35. The court has no difficulty holding, as a matter of law, that English owed SHRI fiduciary duties of care and undivided loyalty. And it seems probable that his acts breached the duty of loyalty. But on the analyses before it the court cannot say as a matter of law. Furthermore, though the plaintiffs raise the issue of causation (ECF No. 72 at 9), neither party has given the court sufficient analysis to decide whether, in these circumstances, English's approving the Third Amended Complaint proximately caused damage. A lawsuit against SHRI was already pending. And others beyond English were involved on the plaintiffs' side of that lawsuit. Whatever role English played in "authorizing" an amended complaint in that suit (which is now, of course, this suit), it is conceivable that his role was too attenuated to constitute proximate cause. Somewhat strikingly, the parties have not provided case law, or attempted any helpfully detailed, non-conclusory analysis, of how fiduciary-duty rules play out in the specific situation of a director having some hand in suing his own company.[66] The court thinks that the defendants have raised a sufficient

---

[66] The plaintiffs may come closest on this point when they write: "A creditor of a corporation is not deprived of his rights by reason of the fact that he is a director." (ECF No. 72 at 8) (quoting *Rankin v. Frebank Co.*, 47 Cal. App. 3d 75 (1975)). This note is less than helpful. The fiduciary-breach claim here has nothing to do with English's status as an SHRI creditor; no evidence that the court has seen suggests that he was a creditor. And the plaintiffs give no mediating explanation of how their very general quote is supposed to say something useful about English's rather different situation.

United States District Court
Northern District of California

issue to get their claim to the jury. On the undisputed facts currently before it, the court could not enter summary judgment *against* the defendants' fiduciary-breach claim. But neither can it grant affirmative summary judgment on the breach, causation, and damages elements of that claim. The court thus grants the defendants a partial summary judgment on the "existence of duty" element of their fiduciary-breach claim.

### 6. Inspection of records

The defendants move the court for summary judgment against the plaintiffs' second and third claims. These claims both allege that the defendants have denied the plaintiffs access to corporate records. The second claim is brought by plaintiffs English and Sons, the Formatts, Mehrok, and the Sehhats against defendant Strege; it contends that since 2011 Strege has denied these plaintiffs their right to inspect SHCC's corporate records (specifically, a "list of SHCC members," "accounting books," and "minutes"). (3AC – ECF No. 1-14 at 13 [¶¶ 64-68].) The third claim is similar. It is brought by plaintiffs Cole and Donna English against SHRI; it alleges that, though the Englishes are SHRI shareholders, the company has since 2011 "refused to permit" them to inspect the company's "accounting books" and "minutes." (*Id.* at 13 [¶¶ 69-73].)

The court denies the defendants' motion on these claims. This is the one area where material factual disputes exist. With respect to SHCC, Cole English claims that he asked for but was not given access to the company's records; Strege responds that SHCC provided its members with "copies of minutes" and "financial statements." (C. English Decl. – ECF No. 65 at 3 (¶ 14); Strege Decl. – ECF No. 63-1 at 2-3 [¶ 9]). The documentary evidence does not resolve the issue. Strege has submitted the consolidated SHCC financial statements that were sent to "all SHCC members" in 2007, 2008, and 2009; but this does not contain a member list, accounting books, or minutes. (*See* ECF No. 63-2).

For the SHRI records, Cole English again declares that he asked to inspect this material but was refused access. (C. English Decl. – ECF No. 65 at 6 [¶ 31].) The defendants have quoted testimony in which English apparently said both that he realized that he could have accessed those records when he was an SHRI director, but declined to, and that Strege never denied him access to

the SHRI records. (ECF No. 61 at 19-20.) That testimony might suffice to defeat the SHRI-related inspection claim. As the plaintiffs point out, however, the defendants have not filed the relevant pages of Cole English's deposition, which consequently are not part of the summary-judgment record.

The court notes that both parties' submissions are imprecise in their dates. The plaintiffs' claims allege being denied access to corporate records since 2011. The evidence that the plaintiffs submit, however, discusses requests made (and allegedly) denied in 2009 and 2010. The defendants' submission claims that SHCC members were given access but, except in the case of the financial statements, does not specify a date and, to that extent, does not helpfully respond to the plaintiffs' allegations.

The court denies the defendants' motion on these claims.

## CONCLUSION

The court's central holding is that the plaintiffs were not empowered to take the actions that they did after the June 2011 dissolution vote — that everything that they did after that date, as the putative board of a reformed SHCC, is null. All SHCC assets remain owned as they were in June 2011, by SHCC as then constituted, and under the control of SHCC's then existing board. The plaintiffs are ordered to roll back everything that they did as a putative rump SHCC and to work with the defendants to restore the status quo as it existed at the filing of the October 2011 lawsuit. As discussed earlier in this order, the parties should confer and may inform the court of the precise steps needed, and any further orders that are required, to restore that status quo. With that core holding set down, the court holds as follows on the parties' motions and specific claims and counterclaims:

- *Claim 2*. The defendants' motion is denied.
- *Claim 3*. The defendants' motion is denied.
- *Claim 4*. The plaintiffs' motion is denied.
- *Claim 5*. The plaintiffs' motion is denied.
- *Claim 6*. The plaintiffs' motion is denied.

United States District Court
Northern District of California

- *Claim 7*. The plaintiff's motion is denied. The defendants' motion is granted.
- *Counterclaim 1*. The court grants the defendants partial summary judgment. The court grants the defendants summary judgment on the existence of a duty; the court denies summary judgment on the issues of breach, proximate cause, and damage.
- *Counterclaims 6, 8, 10*. The defendants' motion is denied.
- *Counterclaim 17*. The plaintiffs' motion is denied. The court grants the defendants summary judgment.
- *Counterclaim 18*. The defendants' motion is granted.
- *Counterclaim 19*. The defendants' motion is granted.
- *Counterclaim 23*. The court grants the defendants partial summary judgment. The court grants the defendants summary judgment on all elements of conversion except damages.

The case-management order now requires the parties to confer on April 4, 2016 about their pretrial filings and to file their first-round filings on April 14. As part of their April 4th meeting, the parties must also discuss the implications of this order and as, mentioned above, the next steps needed to implement it. The parties must then file a joint case-management statement addressing the issues raised in this order. The court sets a case-management conference for April 7 at 11 a.m. and directs the filing of the joint case-management statement by no later than 3 p.m. on April 6.

This disposes of ECF Nos. 55, 60, and 61.

**IT IS SO ORDERED.**

Dated: April 1, 2016

_____

LAUREL BEELER
United States Magistrate Judge